Steven M. Hecht (SH-0414)
Jason Halper (JH-9957)
**LOWENSTEIN SANDLER PC**
Attorneys at Law
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
*Attorneys for Plaintiff*
*FaceTime Communications, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FACETIME COMMUNICATIONS, INC., | **DOCUMENT ELECTRONICALLY FILED** |
| Plaintiff, | Civil Action No. 08-4730 (CM) |
| v. | |
| REUTERS LIMITED, | |
| Defendant. | |

**PLAINTIFF FACETIME'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

                                                                                      **Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 3

    A.    Reuters' Instant Messaging Service and FaceTime's Compliance Solutions .......... 3

    B.    The Source Code Licensing Agreement and Reuters' Option to Purchase ............ 5

    C.    Reuters' Failure to Exercise Its Option By The Contractual Deadline................... 6

ARGUMENT ........................................................................................................................... 8

    I.    THE PARTIES' CONTRACT HAS EXPIRED UNDER NEW YORK LAW ...... 9

        A.    It Is Undisputed That Reuters Failed To Exercise Its Option To Extend Its License By The January 31, 2008 Deadline. ........................ 9

        B.    Having Failed To Comply With The Explicit And Clear Terms Of The Contract, Reuters Is Not Entitled To Equitable Relief. ............................ 11

    II.    REUTERS MUST CEASE USING FACETIME'S SOURCE CODE AND ALL OTHER "LICENSED MATERIALS" AS OF JULY 31, 2008. ................... 14

CONCLUSION ..................................................................................................................... 14

# **TABLE OF AUTHORITIES**

**Pages**

**CASES**

*Agostino v. Soufer*, 12 A.D.3d 204, 784 N.Y.S.2d 103 (1st Dep't 2004) .................................. 11

*Chase Manhattan Bank v. Motorola, Inc.*, 184 F. Supp. 2d 384 (S.D.N.Y. 2002) ...................... 11

*Ittleson v. Barnett*, 304 A.D.2d 526, 758 N.Y.S.2d 360 (2d Dep't 2003) ..................................... 9

*J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*,
   42 N.Y.2d 392, 397 N.Y.S.2d 958 (1977) ........................................................................ 12

*Kunze v. Arito, Inc.*, 48 A.D.3d 272, 851 N.Y.S.2d 182 (1st Dep't 2008) ............................ 11, 12

*Record Club of America v. United Artists Records, Inc.*,
   890 F.2d 1264 (2d Cir. 1989) ................................................................... 1-2, 8, 12-13

*Soho Development Corp. v. Dean & DeLuca Inc.*,
   131 A.D.2d 385, 517 N.Y.S.2d 498 (1st Dep't 1987) ........................................................ 12

*Taste of Society, L.C. v. Ciffone*, 2006 WL 760270 (S.D.N.Y. March 23, 2006) ...................... 8-9

*Urban Archaeology Ltd. v. Dencorp Invs., Inc.*,
   12 A.D.3d 96, 783 N.Y.S.2d 330 (1st Dep't 2004) ......................................................... 9-10

**FEDERAL RULES OF CIVIL PROCEDURE**

*FED. R. CIV. P.* 56 ............................................................................................................... 1

*FED. R. CIV. P.* 57 ............................................................................................................... 3

**MISCELLANEOUS**

3 *Corbin on Contracts* § 11.17 (Eric Mills Holmes, ed. 1996) .................................................. 10

15 *Williston on Contracts* § 46:12 (Richard A. Lord, ed. 2000) ................................................ 10

Plaintiff FaceTime Communications, Inc. ("FaceTime") respectfully submits this brief in support of its motion for summary judgment under *Fed. R. Civ. P.* 56(a) and 56(c).

## INTRODUCTION

This case arose because Defendant Reuters Limited failed to exercise an option by the deadline set forth in the parties' written contract. Reuters now insists that its failure to timely exercise that option should somehow be excused. But the deadline in the contract was clear and unambiguous; and so is the law on this issue. FaceTime therefore moves for summary judgment.

The contract had a two-year term, and provided Reuters with a non-exclusive license to use FaceTime's proprietary source code in connection with Reuters' instant messaging network for financial professionals. The contract also granted Reuters an option to extend the license in perpetuity -- provided that Reuters exercised its option and made a one-time payment of $150,000 before the contract's two-year term expired on January 31, 2008. It is undisputed that Reuters failed to exercise its option or make the required payment by the January 31 deadline. Under these circumstances, New York law is crystal clear: an option expires according to its terms if it is not exercised within the time specified in the agreement. Reuters plainly failed to do that here. Accordingly, FaceTime moves for summary judgment, and seeks a declaration from the Court that Reuters' option and the parties' contract have expired.

Reuters attempts to tiptoe around the contract (and New York law) by arguing that its failure to timely exercise its option should be excused on equitable grounds. According to Reuters, the situation here is analogous to a real estate tenant who fails to timely renew a lease, and thus Reuters insists that it will suffer a "forfeiture" if the parties' contract is deemed to be over. That is a false analogy. This is business license dispute, not a real estate case. In fact, the Second Circuit addressed this very distinction in *Record Club of America v. United Artists*

*Records, Inc.*, 890 F.2d 1264 (2d Cir. 1989).  There, the Second Circuit observed that in certain limited circumstances, New York courts have excused a real estate tenant's late exercise of a renewal or purchase option on equitable grounds -- but only where the tenant had made significant improvements to the property such that the tenant would forfeit permanent and valuable fixtures to the landlord if the lease was deemed terminated.  The Second Circuit held that those factors are not present in a business licensing dispute.  In fact, the court noted that there is not a single New York case finding a forfeiture or otherwise excusing a licensee's failure to strictly comply with the option's terms.  And as far as we have been able to discover, in the 20 years since *Record Club*, there still is not one New York case finding a forfeiture outside of the real estate context.  Reuters' cries of equity are therefore not supported by New York law.

In short, Reuters cannot avoid the fact that there was a clear deadline in the parties' negotiated contract that it failed to comply with.  Nor can Reuters seek an end-run around the contractual deadline by claiming that the deadline was somehow waived -- given that, among other things, the contract contained an unambiguous "no waiver" provision that precludes any contractual term or condition from being waived or otherwise modified.  Accordingly, the Court need not look beyond the four corners of the contract to decide this case.  For these reasons, FaceTime respectfully submits that the Court should grant its motion for summary judgment, declare that Reuters' option has expired under New York law, and that the parties' contract terminated as of January 31, 2008 according to its terms.  *See* **Point I below**.

The contract expressly states that if Reuters failed to exercise its option by the January 31 deadline, the contract would terminate according to its terms and Reuters would have a six-month "exit period" to continue using FaceTime's proprietary source code to facilitate an orderly transition of services for the end-users of Reuters' instant messaging service.  As such,

2

FaceTime also seeks a declaration from the Court that the six-month "exit period" is set to expire on July 31, 2008, and that Reuters must thereafter cease using FaceTime's proprietary source code and return all licensed materials back to FaceTime.  *See* **Point II below.**

One final issue warrants mention.  A decision on this discrete dispute now, before the July 31 deadline, will provide the parties with a clear answer as to whether the license is still in effect, and whether Reuters must cease using FaceTime's proprietary source code.  But if Reuters continues to use FaceTime's proprietary source code after the "exit period" expires on July 31 (as it has threatened to do), this dispute could mushroom into a much larger and complex case involving claims of federal copyright infringement and breach of contract, among others.  Accordingly, FaceTime respectfully urges the Court to decide its summary judgment motion and its request for declaratory relief promptly in accordance with *Fed. R. Civ. P.* 57, which permits a court to "order a speedy hearing of a declaratory-judgment action."  A prompt resolution of this case is appropriate, given that the contract language is unambiguous; the law in New York requires strict compliance with option agreements; and it is undisputed that Reuters failed to exercise its option within the stated window of time.

## FACTUAL BACKGROUND

### A.    Reuters' Instant Messaging Service and FaceTime's Compliance Solutions

Instant messaging, once the province of chatty teenagers, has now become part and parcel of advanced communications networks at many corporations.  Financial services businesses, such as banks, broker/dealers, mutual funds, hedge funds and investment advisors, are leading users of instant messaging.  *See Declaration of Kailash Ambwani*, *dated June 16, 2008 ("Ambwani Decl.")*, ¶ 3.  Instead of using more traditional phone or e-mail communications, many market professionals now use instant messaging as a faster and more

3

efficient way to communicate with their customers, colleagues and market contacts. *Id.*

Defendant Reuters is a global news and financial data service organization. In or around November 2002, Reuters released an instant messaging software application for financial professionals called "Reuters Messaging," which allows financial professionals to communicate in "real time" over the Internet. *Id.* ¶ 5. The Reuters Messaging service is currently connected with three of the largest instant messaging vendors -- AOL Instant Messenger, Yahoo! Messenger and MSN Messenger. As such, financial professionals using the Reuters service can "IM" with their counterparts in the Reuters Messaging community, as well as those using the AOL, Yahoo! or MSN networks.

Unfortunately, the increased use of instant messaging has also led to an increased risk of malicious use, including unsolicited messages, electronic viruses or worms, and spyware. *Id.* ¶ 4. It appears that the hacker and virus-writing communities have wasted no time in exploiting these vulnerable channels. In addition, as instant messaging networks such as Reuters Messaging grew in popularity among financial services industries, there arose the need for compliance solutions to allow those industries to archive and audit the ever-growing number of instant messages -- in light of the regulatory requirements of the Securities and Exchange Commission, New York Stock Exchange, the Sarbanes-Oxley Act of 2002, and the like. *Id.* ¶ 2.

Plaintiff FaceTime is a California-based company that has developed software products which enable instant messaging networks to comply with the various regulatory requirements, and has successfully marketed its proprietary software to financial services businesses, including a significant number of Reuters Messaging customers. *Id.* FaceTime's software solutions are therefore used by major U.S. financial institutions for security, management and compliance of real-time communications.

4

**B.    The Source Code Licensing Agreement and Reuters' Option to Purchase**

To better ensure the compliance needs of Reuters Messaging customers and the security of its instant messaging network, Reuters began discussions with FaceTime in 2005 to acquire a license to use FaceTime's proprietary source code. *Id.* ¶ 6. After several months of negotiations, the parties entered into a Source Code Licensing Agreement, dated January 31, 2006 (the "Agreement"), in which FaceTime agreed to provide Reuters with a non-exclusive license to use certain FaceTime source code and other "Licensed Materials." *Id.* ¶ 7. In exchange, Reuters agreed to make eight separate payments to FaceTime totaling $1.3 million. There is no dispute in this case that those payments have been made. A copy of the Agreement is attached as Exhibit A to the accompanying declaration of FaceTime's CEO, Kailash Ambwani.

Under Section 8.1 of the Agreement, the term of the license was for a period of two years, beginning on January 31, 2006 and ending on January 31, 2008. *Id.*, Ex. A. Section 6.2 of the Agreement, in turn, provided Reuters with an irrevocable option to purchase a perpetual, non-exclusive license to use the FaceTime source code and the "Licensed Materials" set forth in the Agreement for a one-time payment of $150,000. *Id.*, Ex. A § 6.2.

The Agreement, however, specified that Reuters had to exercise its option by a specific date. In particular, Section 6.2 of the Agreement provided that:

> Reuters shall have the right to exercise its Perpetual License Option at any time prior to January 31, 2008 and must make payment to FaceTime of the Perpetual License Fees on or before January 31, 2008, unless such date is extended by operation of the express terms of this Agreement.

*Id.*, Ex. A.

Section 6.2 therefore clearly and unambiguously provided that Reuters' option to purchase a perpetual license from FaceTime had to be exercised *before* January 31, 2008, and

5

Reuters had to make a $150,000 payment to FaceTime *on or before* the January 31, 2008 deadline for the option to be properly exercised.

The parties expressly recognized that the Agreement would terminate according to its terms if Reuters failed to exercise its option to purchase a perpetual license. Specifically, Section 6.2 of the Agreement goes on to state that:

> *In the event that Reuters elects not [to] exercise its Perpetual License Option or fails to make payment of the Perpetual License Fee when due, Reuters license to use the Licensed Materials shall terminate on such date*, provided that such license termination shall not affect Reuters' right, title or interest in any intellectual property of whatever nature in the Derivative Works exclusive of the Licensed Materials.

*Id.*, Ex. A § 6.2 (emphasis added).

### C.  Reuters' Failure to Exercise Its Option By The Contractual Deadline

Reuters did not exercise its option or make a $150,000 payment to FaceTime to purchase a perpetual license by the January 31, 2008 deadline. *See Declaration of Scott Case, dated June 16, 2008 ("Case Decl.")*, ¶¶ 3-4; *Declaration of Deric Moilliet, dated June 16, 2008 ("Moilliet Decl.")*, ¶¶ 2-3; *Declaration of Jim Obrien, dated June 16, 2008 ("Obrien Decl.")*, ¶¶ 3-4. Accordingly, under the plain language of Section 6.2, the Agreement terminated as of January 31, 2008.

On February 13, 2008, FaceTime's General Counsel, Jim Obrien, sent a letter to Reuters to memorialize the fact that the Agreement had expired on January 31, 2008. *Obrien Decl.*, Ex. A. The February 13 letter reminded Reuters that under Section 8.4.2 of the Agreement, Reuters could continue using FaceTime's source code and other "Licensed Materials" (as defined in the Agreement) for a six-month "exit period" to facilitate an orderly transition of services for the end-users of the Reuters Messaging service. *Id.* According to the Agreement, however, Reuters must cease using FaceTime's source code and must return all

6

Licensed Materials to FaceTime at the end of the six-month exit period -- *i.e.*, by July 31, 2008. *Ambwani Decl.*, Ex. A § 8.4.1.

Around that same time, FaceTime's Vice President of Corporate Development, Deric Moilliet, had phone conversations with Reuters' Global Head of Marketing and Strategy, Eran Barak, and Reuters' Senior Vice President of Strategic Alliances, Chris Lamb. *Moilliet Decl.* ¶¶ 2-3. Mr. Moilliet advised those individuals of the termination of the Agreement and extended to them an invitation to discuss terms for a new agreement for the license of FaceTime's software. *Id.* At no time did Messrs. Barak or Lamb dispute that Reuters had failed to exercise its option by the January 31, 2008 deadline. *Id.*

Instead, on February 19, Mr. Lamb sent an e-mail to FaceTime's accounts receivable department. *Case Decl.* ¶ 2. The e-mail stated in full: "Last Friday we wired $150,000 USD to Facetime [sic] as the final payment for our agreement with you with an effective date of 31 January 2006. Please confirm that you have received and accepted these funds." *Id.*, Ex. A (*see* earliest e-mail on the thread, sent on February 19 at 11:27 a.m.).

After checking its records, FaceTime confirmed that it had received an unsolicited wire transfer from Reuters for $150,000. *Id.* ¶ 3. The wire transfer, however, was sent by Reuters on February 15, 2008 -- a full two weeks after Reuters' option to purchase a perpetual license from FaceTime had already expired, and after Reuters had been notified in writing (and verbally) of the option's expiration and the termination of the Agreement. *Id.* Thus, on February 20, FaceTime's Chief Financial Officer, Scott Case, sent a response e-mail to Mr. Lamb. *Id.*, Ex. A. Mr. Case's e-mail reminded Mr. Lamb that the "agreement with Reuters terminated January 31, 2008. Payment was required by that date to meet the terms of that expired agreement." *Id.* Mr. Case further stated in his e-mail that FaceTime was returning the $150,000 to Reuters, less

7

$65,453.50 for certain payments that remained outstanding to FaceTime. *Id.* Accordingly, $84,546.50 was thereafter wired back to Reuters. *Id.* ¶ 5.

Nearly seven weeks later, on April 7, Carolyn Blankenship (Reuters' Senior Vice President & Principal Legal Counsel, Intellectual Property) sent a letter to FaceTime's General Counsel, Jim Obrien. *Obrien Decl.*, Ex. B. Ms. Blankenship's letter asserted, among other things, that Reuters' late attempt to exercise the option to purchase a perpetual license from FaceTime would somehow be upheld as valid under New York law. *Id.* Ironically, the sole authority cited in Ms. Blankenship's letter, *Record Club of America v. United Artists Records, Inc.*, 890 F.2d 1264, 1272 (2d Cir. 1989), actually stands for the exact opposite position. The Second Circuit in *Record Club* held that the district judge's decision to excuse a late exercise of an option to renew a license agreement on equitable grounds "was not authorized by New York law on the record before it, if at all." *Id.* In any event, Ms. Blankenship and Mr. Obrien thereafter had a series of phone conversations regarding the parties' respective positions concerning the termination of the Agreement. *Obrien Decl.* ¶ 11. In those conversations, Reuters continued to take the position that it has a legal right to retain its license to use FaceTime's source code and the "Licensed Materials" in perpetuity. *Id.*

Accordingly, FaceTime was forced to bring this action to seek a declaration that Reuters' option to purchase a perpetual license from FaceTime expired according to its terms, that the Agreement terminated as of January 31, and that Reuters therefore has no right to the continued use of the "Licensed Materials" after the six-month "exit period" expires on July 31.

## ARGUMENT

Summary judgment is appropriate in a contract action where "the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *Taste of*

*Society, L.C. v. Ciffone*, 2006 WL 760270, *2 (S.D.N.Y. March 23, 2006) (McMahon, J.) (granting summary judgment in an action to recover for non-payment of a promissory note). Contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (citation omitted). That is what we have here. The language of the Agreement is clear. And there is no dispute that Reuters failed to exercise its option to extend its license to use FaceTime's proprietary source code by the January 31, 2008 deadline expressly set forth in the Agreement. As outlined below, New York law[1] in these circumstances holds that an option expires when it is not exercised in strict compliance within the specified window of time. FaceTime therefore respectfully submits that its motion for summary judgment, and its request for declaratory relief, should be granted.

I. **THE PARTIES' CONTRACT HAS EXPIRED UNDER NEW YORK LAW**

    A. **It Is Undisputed That Reuters Failed To Exercise Its Option To Extend Its License By The January 31, 2008 Deadline.**

An option is an irrevocable offer for a specified period of time. By the very nature of an option, the deal may or may not come to pass. As such, the option holder has absolute control over whether the deal will be completed. Given the one-sided nature of option agreements, New York law is decidedly unforgiving to option holders, as they must strictly adhere to the conditions of the agreement. *See Ittleson v. Barnett*, 304 A.D.2d 526, 528, 758 N.Y.S.2d 360, 362 (2d Dep't 2003) ("The general rule in regard to options is that the provisions of the contract must be complied with strictly, in the manner and within the time specified."); *Urban Archaeology Ltd. v. Dencorp Invs., Inc.*, 12 A.D.3d 96, 783 N.Y.S.2d 330, 335 (1st Dep't 2004) ("Not only is strict adherence to the terms of an option ordinarily required, but it is a

---

[1] Section 12.6 of the Agreement states that the contract is to be construed under New York law.

broadly accepted principle that time is of the essence with this type of contractual provision.").

There are two basic rationales for requiring strict compliance with the deadline specified in an option contract. First, like any other provision in a negotiated written contract, timely notice of the exercise of the option is a condition that the parties have expressly agreed upon, and thus enforcement of that condition implements the parties' intent. *See* 3 *Corbin on Contracts* § 11.17 (Eric Mills Holmes, ed. 1996). Second, the option holder has the remarkable choice of either not going through with the deal, or exercising the option and thus forcing the option giver to perform under the contract. Therefore, the only protection afforded to the option giver is "the condition that the [option holder] can only exercise [the option] strictly in accordance with its terms." 15 *Williston on Contracts* § 46:12 (Richard A. Lord, ed. 2000).

Here, Reuters did not exercise its option in strict compliance with the clear and unambiguous deadline in the parties' Agreement. Section 6.2 of the Agreement provided that "Reuters shall have the right to exercise its Perpetual License Option at any time prior to January 31, 2008 and must make payment to FaceTime of the Perpetual License Fees on or before January 31, 2008 . . . ." *Ambwani Decl.*, Ex. A. Section 6.2 further states that "[i]n the event that Reuters elects not [to] exercise its Perpetual License Option or fails to make payment of the Perpetual License Fee when due, Reuters license to use the Licensed Materials shall terminate on such date . . . ." *Id.* Section 6.2 therefore quite clearly required Reuters to exercise its option before January 31. It is undisputed that Reuters failed to do this. Instead, Reuters attempted a subterfuge by wiring $150,000 to FaceTime two weeks after the deadline had passed -- and after FaceTime had already provided Reuters with written and verbal notice that the option had expired. *Moilliet Decl.* ¶¶ 2-3; *Obrien Decl.*, Ex. A. That obviously is not strict compliance with the parties' bargained-for deadline. Reuters' option therefore expired according to its terms. *See*

*Kunze v. Arito, Inc.*, 48 A.D.3d 272, 851 N.Y.S.2d 182, 184 (1st Dep't 2008) (it is "a settled principle of law that a notice exercising an option is ineffective if it is not given within the time specified") (citation omitted).

Separate and apart from the fact that Reuters failed to timely exercise its option, Section 12.3 of the Agreement quickly puts to rest any waiver-type argument that Reuters might choose to make. Section 12.3 states that "[n]o changes, modifications, or waivers are to be made to this Agreement unless evidenced in writing and signed for and on behalf of both Parties." Such no-waiver provisions are routinely enforced under New York law. *See Chase Manhattan Bank v. Motorola, Inc.*, 184 F. Supp. 2d 384, 395 (S.D.N.Y. 2002). Here, the parties never signed any modification to the Agreement or otherwise agreed to extend the January 31 deadline.

Under these circumstances, summary judgment is appropriate. *See Agostino v. Soufer*, 12 A.D.3d 204, 784 N.Y.S.2d 103, 104 (1st Dep't 2004) (affirming summary judgment where option holder failed to exercise an option in "strict compliance with the terms setting forth the time and manner of [the] option's exercise."). FaceTime thus respectfully submits that the Court should declare that Reuters' option to extend the Agreement has expired under New York law, and that the Agreement terminated as of January 31, 2008 according to its terms.

### B. Having Failed To Comply With The Explicit And Clear Terms Of The Contract, Reuters Is Not Entitled To Equitable Relief.

While Reuters acknowledges that it failed to exercise its option by the January 31 deadline, it insists that under New York law, courts "routinely grant equitable relief to prevent forfeiture of vested rights in the event of an untimely exercise of an option." *Obrien Decl.*, Ex. B (April 7 Letter). That's simply incorrect. The New York courts have excused the late exercise of an option only in certain limited circumstances -- none of which is present in this case.

For instance, in *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 398, 397 N.Y.S.2d 958, 961 (1977), the New York Court of Appeals held that a real estate tenant may be relieved of the consequences of an untimely renewal notice only where the tenant made "valuable improvements" to the property, and would suffer a forfeiture if the lease was terminated. Equity comes into play in that context because the possibility exists that the tenant -- particularly a long-term tenant -- may have installed permanent and valuable fixtures in the property. Thus, if the lease is terminated due to the tenant's inadvertent failure to exercise an option, the tenant forfeits the fixtures to the landlord, who gets an unwarranted windfall.

But contrary to Reuters' claim that the New York courts "routinely" grant equitable relief, the exact opposite is true. *See J.N.A. Realty*, 42 N.Y.2d at 397, 397 N.Y.S.2d at 960 ("the major obstacle to obtaining equitable relief in these cases is that default on an option usually does not result in forfeiture."); *Kunze v. Arito, Inc.*, 48 A.D.3d 272, 851 N.Y.S.2d 182, 184 (1st Dep't 2008) (holding that tenant, a sophisticated businessman, was not entitled to equitable relief where he attempted a late exercise of a renewal option in a residential lease agreement); *Soho Development Corp. v. Dean & DeLuca Inc.*, 131 A.D.2d 385, 386, 517 N.Y.S.2d 498, 500 (1st Dep't 1987) (holding that equity did not relieve tenant of its failure to timely exercise a renewal option where some of the fixtures installed by the tenant could be moved, and the "major costs of improvement" were made early in the rental period).

In any event, Reuters' entire equity/forfeiture argument is a red herring. The Second Circuit has already declared that the equitable factors present when a real estate tenant misses an option deadline do not apply to a business licensing dispute. *See Record Club of America v. United Artists Records, Inc.*, 890 F.2d 1264 (2d Cir. 1989). In *Record* Club, the Second Circuit vacated the district judge's decision to excuse the late exercise of a renewal

12

option by a licensee of music recordings, given that "the court's decision to excuse the late notice was not authorized by New York law on the record before it, if at all." *Id.* at 1272. The court noted that unlike a lease, there are no "improvements" that are left behind for the licensor when a license agreement is terminated. Rather, when the agreement is terminated, the licensee is simply forced to obtain the goods or products from another vendor. The court further stated that:

> We are not aware of any New York case in which a forfeiture has been found in circumstances such as these. Indeed, the New York Court of Appeals in *J.N.A. Realty* noted that the real estate cases are different from cases involving securities or goods precisely because when real estate is involved there may be a forfeiture. *We seriously doubt that the New York courts would deem the loss of a relationship with a licensor or vendor a forfeiture*.

*Id.* at 1274 (emphasis added). Indeed, as far as we can tell, in the 20 years since *Record Club*, there is still not a single New York case finding a forfeiture outside of the real estate context -- let alone a licensing dispute. Accordingly, Reuters' forfeiture argument has no support under New York law.

Finally, even if there could somehow be a forfeiture in a business license dispute, this is certainly not that case. FaceTime will not receive any tangible property or otherwise be unjustly enriched if the Agreement is deemed expired. Indeed, Reuters is not being forced to relinquish its Reuters Messaging software to FaceTime. Nor is Reuters being forced to shut down its instant messaging network, or even give up any customers. Rather, under the plain terms of the Agreement, Reuters will simply not be permitted to use FaceTime's proprietary source code and the other "Licensed Materials" going forward. *Ambwani Decl.*, Ex. A § 8.4.1. That is not a forfeiture. Thus, under New York law, equity cannot relieve Reuters from its failure to exercise its option in strict compliance with the terms of the Agreement.

In sum, Reuters' cries of equity and "forfeiture" are nothing more than an attempt to create the very uncertainties that parties seek to avoid by entering into written contracts in the

13

first place. Reuters' argument, if accepted, would undermine the entire point of including a deadline in the Agreement. Not only did the parties expressly require Reuters to exercise its option by January 31, but Section 6.2 goes even further, and says "[i]n the event that Reuters elects not [to] exercise its Perpetual License Option or fails to make payment of the Perpetual License Fee when due, *Reuters license to use the Licensed Materials shall terminate on such date . . . ."* *Ambwani Decl.*, Ex. A (emphasis added). The contract language is crystal clear and should be interpreted to mean what it says. Summary judgment is thus warranted in this case.

II. **REUTERS MUST CEASE USING FACETIME'S SOURCE CODE AND ALL OTHER "LICENSED MATERIALS" AS OF JULY 31, 2008.**

The Agreement states that if Reuters failed to exercise its option by the January 31 deadline, the contract would terminate according to its terms, and Reuters would have a six-month "exit period" to continue using FaceTime's proprietary source code to facilitate an orderly transition of services for the end-users of Reuters' instant messaging service. *Ambwani Decl.*, Ex. A § 8.4.2. According to the Agreement, however, Reuters must cease using FaceTime's source code and must return all "Licensed Materials" to FaceTime at the end of the six-month exit period -- *i.e.*, by July 31, 2008. *Id.*, Ex. A § 8.4.1.

This contract language is also clear and unambiguous. As such, FaceTime also seeks a declaration from the Court that the six-month "exit period" is set to expire on July 31, 2008 -- and that Reuters must thereafter cease using FaceTime's proprietary source code, or any residual knowledge thereof for any purpose, including the development of it own software, and must return all "Licensed Materials" (as defined in the Agreement) back to FaceTime.

## CONCLUSION

The contract here was negotiated between two sophisticated parties. It had a two-year term, and provided Reuters with an option to extend the contract in perpetuity -- but only if

14

Reuters exercised the option and made a $150,000 payment to FaceTime by January 31, 2008. It is undisputed that Reuters failed to do that. FaceTime thus respectfully submits that its motion for summary judgment should be granted, and that the Court should declare that: *(1)* the Agreement terminated as of January 31, 2008 due to Reuters' failure to exercise its option by the contractual deadline, and *(2)* as of July 31, 2008, Reuters must cease using FaceTime's source code and all other "Licensed Materials" in any manner for any purpose.

        Respectfully submitted,

        Steven M. Hecht (SH-0414)
        Jason Halper (JH-9957)
        **LOWENSTEIN SANDLER P C**
        1251 Avenue of the Americas, 18th Floor
        New York, New York 10020
        973.597.2500
        973.597.2400 (Fax)
        shecht@lowenstein.com
        *Attorneys for Plaintiff*
        *FaceTime Communications, Inc.*

        By: /s  Steven M. Hecht (SH-0414)

Dated: June 16, 2008