Steven M. Hecht (SH-0414)
Jason Halper (JH-9957)
**LOWENSTEIN SANDLER PC**
Attorneys at Law
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
*Attorneys for Plaintiff*
*FaceTime Communications, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FACETIME COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> REUTERS LIMITED, <br><br> Defendant. | **DOCUMENT ELECTRONICALLY FILED** <br><br> Civil Action No.  08-4730 (CM) <br><br> **DECLARATION OF KAILASH AMBWANI IN SUPPORT OF PLAINTIFF FACETIME'S MOTION FOR SUMMARY JUDGMENT** |

I, **KAILASH AMBWANI,** being of full age, hereby declare as follows:

1.      I am the President and Chief Executive Officer of Plaintiff FaceTime Communications, Inc. ("FaceTime").  I have more than 20 years experience in the consumer and enterprise software and services industries.  I make this declaration to put forth certain facts and documents in support of FaceTime's motion for summary judgment.  Except as indicated below, I have personal knowledge of the matters stated in this declaration.

**<u>FaceTime's Compliance Solutions for Instant Messaging Networks</u>**

2.      Plaintiff FaceTime is a California-based company that has developed software products which enable instant messaging networks to archive and audit instant messages.  FaceTime's products allow its customers to, among other things, comply with

regulatory requirements of the Securities and Exchange Commission, New York Stock Exchange, the Sarbanes-Oxley Act of 2002, and the like.

3.     Financial services business, such as banks, broker/dealers, mutual funds, hedge funds and investment advisors, are leading users of instant messaging.  Instead of using more traditional phone or e-mail communications, many market professionals now use instant messaging as a faster and more efficient way to communicate with their customers, colleagues and market contacts.

4.     The use of instant messaging has risks of malicious use, including unsolicited messages, electronic viruses or worms, and spyware.  To address these risks, FaceTime has developed proprietary software to enable it to offer security solutions for instant-messaging networks to its customers.

## The Source Code Licensing Agreement

5.     Prior to 2003, Defendant Reuters released an instant messaging software application for financial professionals called "Reuters Messaging," which allows financial professionals to communicate in "real time" over the Internet.  FaceTime subsequently developed proprietary software to provide compliance and security functionality for Reuters Messaging.

6.     In 2005, Reuters began discussions with FaceTime to acquire a license to use FaceTime's proprietary source code to enable Reuters to provide a Reuters-branded compliance product offering to its Reuters Messaging customers, and to obtain certain security functionality for its instant messaging network.

7.     After several months of negotiations, the parties entered into a Source Code Licensing Agreement, dated January 31, 2006 (the "Agreement"), in which FaceTime

agreed to provide Reuters with a non-exclusive license to use certain FaceTime source code and other "Licensed Materials." A copy of the Agreement is attached as *Exhibit A*.

8.     As explained in the accompanying declarations of Scott Case (FaceTime's CFO), Deric Moilliet (FaceTime's VP of Corporate Development) and Jim Obrien (FaceTime's General Counsel), the Agreement granted Reuters an option to purchase a perpetual license from FaceTime, but required Reuters to exercise its option and make a $150,000 payment to FaceTime before January 31, 2008. Reuters, however, did not exercise its option by the January 31 deadline.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Kailash Ambwani

Dated: June 16, 2008

3

# EXHIBIT A

# Source Code Licensing Agreement

This Source Code Licensing Agreement (the **"Agreement"**) is entered into as of January 31, 2006 (the **"Effective Date"**), between FaceTime Communications, Inc., a Delaware corporation with a principal place of business at 1159 Triton Drive, Foster City, CA 94404 (**"FaceTime"**), and Reuters Limited, of The Reuters Building, South Colonnade, Canary Wharf London E14 5EP, United Kingdom (**"Reuters"**) (Reuters and FaceTime each a "Party" and together the "Parties").

**WHEREAS**, FaceTime has developed software to log, audit, export transcripts to be archived and manage instant messages in the enterprise (the **"IMA Software"** and the **"IMRelay"** software as more fully defined in **Exhibit A**) and has current specified plans to develop additional functionality related to this software; and

**WHEREAS**, Reuters has developed an instant messaging service that enables financial professionals to communicate with their customers and colleagues (**"Reuters Messaging"** or **"Reuters Messaging Service"**, as more fully defined in **Exhibit A**); and

**WHEREAS**, Reuters wishes to acquire from FaceTime a license to the source code of the IMA Software, the source code of the IM Relay product, the source code of software previously customized for Reuters (the **"RMCM Customized Product"** as more fully defined in **Exhibit A**), and the source code of the Additional IMA Functionality, and

**WHEREAS**, Reuters also wishes to acquire from FaceTime a license to the machine-executable object code version of the FaceTime development platform software (**"RTMatrix"** as more fully defined in **Exhibit A**), and

**WHEREAS**, FaceTime wishes to license to Reuters the source code to the IMA Software, IMRelay, the RMCM Customized Product, and the Additional IMA Functionality, along with machine-executable object code version of RTMatrix under the terms and restrictions provided herein,

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. DEFINITIONS

1.1     <u>Definitions.</u>    Capitalized terms used in this Agreement, unless otherwise defined in this Agreement, shall have the meanings as set forth in **Exhibit A** hereto.

## 2. LICENSE GRANT AND RESTRICTIONS

2.1     <u>Description of Source Code and Object Code</u>.  The source code licensed under this Agreement (the "Source Code") shall consist of the human-readable computer programming code, associated procedural code, listings, flow charts, logic diagrams, software tools, executables, libraries, scripts and related and supporting documentation, (including assembly, linkage and other utilities), suitable and sufficient to enable a person possessing reasonable skill and expertise in computer software and information technology (i) to build, load, and operate a machine-executable object code version of the software (the "Object Code"), and (ii) to maintain and support the software.

2.2     <u>Related Materials</u>.  The Source Code will be accompanied by build plans, build tools, unit testing scripts and code, integration tests, automation test scripts, all test plans , technical design specifications, functional specifications and use cases, architecture specifications, used by FaceTime to develop the software using the Source Code, as well as a list of all bugs found (open and closed) in the Source Code. FaceTime has identified in Exhibit B the third-party tools it uses to test the Source Code and Reuters shall be responsible for the licensing of any third-party tool or product it uses and the payment of any applicable license fees due therefore.  The Source Code and object code will also be accompanied by all existing related collateral (such as product manuals, installation guides, configuration guides, white papers, etc).  The plans, tools and documents described in this section shall be referred to as the **"Related Materials"**. FaceTime

# Source Code Licensing Agreement

will also deliver to Reuters the build scripts (if they exist) to build the test tools and any available history to the enable Reuters to track changes FaceTime has made to the Source Code.

2.3 **FaceTime License Grant.** Subject to the terms and conditions of this Agreement, FaceTime grants to Reuters for and on behalf of the Reuters Group a worldwide, non-exclusive, non-sublicensable (except as specified herein), non-transferable license for the Initial Term (and, subject to the exercise of the Perpetual License Option as expressly provided for under this Agreement, for the term of the Perpetual License) to (I) the Source Code and Related Materials for: (a) the IMA Software for the in-stream mode (to support Reuters Messaging) for all platforms the IMA Software supports, (b) the RMCM Customized Product, (c) the IMRelay product, and (d) the Additional Functionality, and (II) the Object Code version of (i) the RTMatrix product, and (ii) the IMA Software for the connector mode for the Microsoft Windows version of the IMA Software only, (to support Microsoft Live Communication Server ("LCS")), together with user documentation for (i) and (ii), ((I) and (II) above collectively the **"Licensed Materials"**) for the uses specified in section 2.4 below.

2.4 **Permitted Use of the Licensed Materials.** Reuters' use of the Licensed Materials shall be strictly limited to the express grant of rights provided in this section.

   2.4.1 **Creation of Derivative Works.** Reuters may use, copy, transform, modify, recast, adapt, decompile, amend, translate, revise, compile, enhance and create derivative works of both the Source Code and the Related Materials (together **"Derivative Works"**) to provide compliance and security solutions in a hosted or deployed fashion for Reuters-branded (or Reuters co-branded) messaging and collaboration services, including the Reuters Messaging Service for use by End Users subject to the limitations herein. Additionally, Reuters may also use the Derivative Works in conjunction with traffic over public instant messaging networks ("PIM") and/or third party instant messaging network providers ("EIM") in its data center when deployed in the session initiation protocol (including any successor protocol thereto, "SIP") only configuration for the sole purpose of managing incoming EIM and/or PIM communication to the Reuters Messaging network.

   2.4.2 **Distribution and Demonstration of the Derivative Works.** Reuters shall be entitled (i) to market, distribute, license and sublicense the Derivative Works to End Users, in machine readable, executable compiled object code version only, directly, or indirectly through Third Party Resellers (as provided for in section 3.2, below), (ii) demonstrate the Derivative Works to potential End Users and Third Party Resellers and (iii) install and use the Derivative Works on Reuters Group systems for internal use. Reuters shall be directly and solely liable to FaceTime for Reuters Group acts or omissions under this Agreement with respect to the Derivative Works, and, subject to the provisions of Section 7 below, Reuters shall defend, indemnify and hold FaceTime harmless against any and all liabilities, costs, damages, losses or expenses arising out of Reuters Group acts and omissions hereunder with respect to the Derivative Works to the same extent had the relevant act or omission been committed by Reuters itself, provided that FaceTime shall remain under a duty to mitigate any such liabilities, costs, damages, losses or expenses. Nothing herein shall be understood to limit FaceTime's indemnification obligations to Reuters under Section 7 of this Agreement.

   2.4.3 **Use of RTMatrix.** Reuters may use RTMatrix to build network bot applications ("Bots") as a service to be deployed in the RM data center and offered on the RM network. Other use of RTMatrix, including the building or deployment of Bots in an onsite or deployed fashion shall be subject to separate licensing terms and fees to be negotiated between Reuters and FaceTime.

2.5 **FaceTime License Restrictions.** Except as otherwise set forth herein or in any amendment hereto, Reuters shall not: (a) distribute, license, sublicense, assign, transfer or copy the Licensed Materials or the Derivative Works; (b) attempt, nor enable any third party to attempt to decompile,

2

# Source Code Licensing Agreement

disassemble, modify, translate, create derivative works of or reverse engineer the Licensed Materials, by themselves or as they may be contained in the Derivative Works, (except to the extent a prohibition on reverse engineering is void as a matter of applicable law, in which case Reuters, and any relevant third party, may do so to the extent required under applicable law); (c) remove, or allow to be removed, any FaceTime copyright, trade secret or other proprietary rights notice from the Licensed Materials (standing by themselves and as contained in the Derivative Works); (d) reproduce the Source Code and Related Materials licensed hereunder except to the extent reasonably necessary (i) to produce the Derivative Works, (ii) for archive, back-up or disaster recovery purposes, (iii) for any testing of the Reuters Messaging Service and/or the Licensed Materials and (iv) for demonstration, education and training End Users and/or Third party Resellers of the Derivative Works; nor (e) permit disclosure of or provide access to the Licensed Materials to any of its directors, officers, employees, contractors, consultants, agents, advisors or any other third parties, except those who (i) have been advised of their highly confidential nature, (ii) have a direct need to know the actual contents thereof for the creation of the Derivative Works, and (iii) are bound by a duty of confidentiality to Reuters that is no less rigorous than Reuters has for its own comparable intellectual property, provided however, that in no event shall Reuters permit disclosure of or provide access to the Licensed Materials to any party who is an officer or employee of, or whom Reuters is aware is an agent or director of, or advisor to, a direct competitor of FaceTime. Nothing in this Agreement shall be construed to restrict Reuters' license rights to the RMCM Customized Product as provided in the Product Customization and Licensing Agreement between the Parties, dated September 29, 2004.

2.6     **Reservation of Rights**.  All rights in the Licensed Materials not expressly granted herein are reserved by FaceTime and/or its licensors. FaceTime shall retain all right, title or interest in any intellectual property of whatever nature in the Licensed Materials and all rights to market and license products using the Licensed Materials in all regards, including marketing and licensing to customers using the Reuters Messaging network under the terms of the Reuters Messaging Compliance Partner Program.  Notwithstanding the foregoing, FaceTime may not market the RMCM Customized Product to customers using the Reuters Messaging network.  FaceTime reserves the right to develop, license, support, install, service and otherwise commercially exploit any and all of its and any third party products, including, without limitation, the IMA Software, either directly to users or indirectly through resellers, distributors and other similar agreements with third parties or other distribution channels. Nothing herein shall be deemed to grant FaceTime ownership of, or any rights with respect to, those parts of the Derivative Works that do not include the Licensed Materials.

2.7     **Ownership of Intellectual Property**.  Except to the extent of FaceTime's rights in the Licensed Materials, FaceTime shall have no right, title or interest in any intellectual property of whatever nature in the Derivative Works.  FaceTime acknowledges and agrees that Reuters owns all right, title and interest in and to Reuters Messaging Service, including, but not limited to, any modifications, versions, documentation, know-how, methodologies, expertise or techniques, or derivative works thereof. FaceTime owns all right, title and interest in and to the Licensed Materials, including, but not limited to, any modifications, versions, documentation, know-how, methodologies, expertise or techniques or derivative works thereof created by FaceTime, including but not limited to the RMCM Customized Product. Except as expressly granted herein, no other licenses from either Party to the other are or shall be deemed granted by virtue of this Agreement or any of the actions or inactions of the Parties in carrying out the terms of this Agreement. In the event that either Party becomes aware of an End User or Third Party Reseller breach or infringement of the other Party's Intellectual Property Rights, the relevant Party shall promptly notify the other thereof.

# 3.   DISTRIBUTION OF DERIVATIVE WORKS

3.1     **End User Agreements**.

3

# Source Code Licensing Agreement

3.1.1 **Commercial EULA.** Reuters shall ensure that each End User of the Derivative Works is bound by the terms of a Reuters End User License Agreement(s) substantially in the form attached to Exhibit C hereto (the "**EULA**") the provisions of which shall be no less protective of FaceTime's rights, title and interest in and to the Licensed Materials and any of its other Confidential Information, than the terms of this Agreement including, but not limited to, this section, and all provisions pertaining to license restrictions, proprietary rights, indemnification, term & termination, limitation of liability, warranties, and confidentiality. To the extent that any modification, supplement or amendment to the terms of an EULA result in such EULA providing less protection of FaceTime's rights in and to the Licensed Materials or the Derivative Works, Reuters shall indemnify and hold FaceTime harmless against any liabilities, costs, damages, losses or expenses arising out of or relating to any third party claim to the extent the claim is based on such modification, supplement or amendment, provided that FaceTime shall remain under a duty to mitigate any such liabilities, costs, damages, losses or expenses. For the avoidance of doubt, FaceTime has reviewed the current EULA, attached hereto as Exhibit C, and acknowledges that it is no less protective of FaceTime's rights, title and interest in and to the Licensed Materials and any of its other Confidential Information, than the terms of this Agreement.

3.1.2 **Evaluation License Agreements.** During the Term of this Agreement, Reuters, members of the Reuters Group and its Third Party Resellers shall be entitled to offer Derivative Works in Object Code version only on a trial basis to potential customers under a EULA or a free trial letter substantially in the form of Exhibit E hereto.

3.2 **Third Party Resellers.** Reuters shall have the right to appoint Third Party Resellers to market, distribute and sublicense Derivative Works to End Users, in machine readable, executable compiled Object Code version only as set forth in section 2.4 above, provided that Reuters shall have executed a written sub-distribution agreement with each such Third Party Reseller, which sub-distribution agreement shall contain (i) provisions that are no less protective of FaceTime's rights, title and interest in and to the Licensed Materials and any of its other Confidential Information, than the terms of this Agreement, (ii) a provision prohibiting such Third Party Resellers from sublicensing the rights granted to it in that agreement, (iii) an express acknowledgement by such Third Party Resellers that if this Agreement shall terminate for any reason, then such sub-distribution agreement shall automatically terminate without further action on the part of Reuters ("**Sub-Distribution Agreement**"). End User licenses granted by Third Party Resellers pursuant to the terms of a Sub-Distribution Agreement shall conform in all material respects to the requirements set forth under section 3.1.1. Reuters will use reasonable business efforts to ensure that all Third Party Resellers (i) abide by the terms of the Sub-Distribution Agreements between Reuters and such Third Party Resellers and (ii) enforce the terms of each EULA.

3.2.1 **Third Party Beneficiary Status and Enforcement.** Reuters shall use reasonable business efforts to make FaceTime a direct and intended third party beneficiary with full rights to enforce the terms of each Sub-Distribution Agreement against each Third Party Reseller ("**Third Party Beneficiary Rights**"). To the extent that (i) FaceTime is not made such a third party beneficiary to any Sub-Distribution Agreement, or (ii) the applicable laws governing any Sub-Distribution Agreement, do not permit or recognize FaceTime's Third Party Beneficiary Rights, Reuters agrees to cooperate with and assist FaceTime, at FaceTime's expense, in a suit against an End User using Licensed Materials in breach of a EULA whenever requested to do so by FaceTime including, but not limited to, joining as a party to the suit if under applicable law Reuters joinder is required. If FaceTime, despite Reuters actions above, can not bring suit against the End User, Reuters shall remain liable to FaceTime for all liabilities, costs, damages, losses or expenses arising out of or relating to any breach of such agreements, provided that FaceTime shall remain under a duty to mitigate any such liabilities, costs, damages, losses or expenses.

3.3 **Export Control.** FaceTime agrees to comply with all relevant export laws and regulations of the United States and other countries (collectively, Export Laws) to ensure that the delivery hereunder to Reuters of Licensed Materials and the Related Materials or any portion of them is not, directly

4

# Source Code Licensing Agreement

or indirectly, in violation of Export Laws. Reuters and its affiliates shall, and shall require that each End User and Third Party Reseller, complies with all relevant export laws and regulations of the United States and other countries (collectively, *Export Laws*) of the Derivative Works, and shall not export or re-export the either, nor any direct product thereof, contrary to such Export Laws.

3.4     **Third Party Software**. A schedule of third party software utilized by the Licensed Materials is attached in Exhibit B ("**Third Party Software**"). Reuters shall be solely responsible for compliance with any license terms or restrictions associated with the Third Party Software, and Reuters shall indemnify and hold FaceTime harmless against any liabilities, costs, damages, losses or expenses arising out of or relating to a breach of this Section 3.4, subject to the provisions of Section 7 of this Agreement.

3.5     **Right of Branding**. Subject to the terms of this Agreement, FaceTime grants to Reuters the right to brand the Derivative Works in its sole discretion.

3.6     **Marketing**. Subject to the terms of this Agreement, Reuters shall have the right to market the branded Derivative Works in its sole discretion.

4.     **DELIVERY AND VERIFICATION OF OBJECT CODE AND SOURCE CODE**

4.1     **Delivery Schedule**. FaceTime shall be responsible for delivery to Reuters of the Object Code and Source Code for the software licensed hereunder according to the following schedule:

| Software | Object Code Delivery | Source Code Delivery |
|---|---|---|
| IMA Software (with non-RM networks) | April 30, 2006 | None |
| Additional Functionality | | |
| RM Chat | April 30, 2006 | April 30, 2006 |
| RM Forms | April 30, 2006 | April 30, 2006 |
| IM Relay | April 30, 2006 | April 30, 2006 |
| RMCM Custom Product | April 30, 2006 | April 30, 2006 |
| RTMatrix | April 30, 2006 | None |
| IMA Software (without non-RM networks) | May 15, 2006 | May 15, 2006 |
| Additional Functionality | | |
| Multi-tenancy | August 30, 2006 | August 30, 2006 |

In each case, FaceTime shall be responsible for delivery to Reuters of the applicable Related Materials with the delivery of the Source Code.

4.2     **Additional Functionality Verification Criteria**. With respect to the Object Code for each component of the Additional Functionality, Reuters shall be entitled to verify that (a) such component's features meet the applicable specification described in Exhibit D with one hundred percent (100%) of the test cases (also described in Exhibit D) executed and at least ninety percent of the applicable test cases being passed, and (b) such component is free of any error that meets the definition of either a "Critical" or "High" category problem as such terms are defined in Exhibit D.

4.3     **Source Code Verification Criteria.** With respect to the Source Code for the software delivered to Reuters according to section 4.1, Reuters shall be entitled to verify that such Source Code may be compiled, using the tools and procedures specified in the Licensed Materials, to the Object Code form of the software provided to Reuters.

**Source Code Licensing Agreement**

4.4     <u>Verification Period.</u> Subject to adjustment pursuant to section 4.9 below, Reuters shall have two period of thirty (30) days (each a "**Verification Period**") first from (a) May 15, 2006 for the verification of the Object Code and Source Code delivered on April 30, 2006 and May 15, 2006, and then from (b) August 30, 2006 for the verification of the Object Code and Source Code delivered on August 30, 2006, to perform the applicable verification tests specified above. The parties acknowledge and agree that the verification testing will require their close communication and co-operation and they each undertake to use all reasonable endeavors to ensure that the verification testing is completed as soon as reasonably possible within the Verification Period. FaceTime shall reasonably assist Reuters in respect of the verification testing. If Reuters is able to verify the Object Code of a component of the Additional Functionality using the verification tests specified in Exhibit D or verify Source Code according to the criteria specified in section 4.3, Reuters shall, in each case promptly provide FaceTime with written notification of such verification. If Reuters is unable to (i) verify the Object Code of a component of the Additional Functionality using the verification tests specified in Exhibit D or (ii) verify Source Code according to the criteria specified in section 4.3, (an occurrence of either (i) or (ii) an "**Exception**") it shall promptly provide FaceTime with written notification of such Exception. The Parties agree to immediately use commercially reasonable efforts to work in good faith to determine the cause of such Exception and to rectify any errors that are found until the Exception has been corrected and the applicable software has been verified. The parties acknowledge and agree that time is of the essence in scheduling and taking their respective actions pertaining to verification testing and the rectification of any Exception during the Verification Period, and in executing their obligations of prompt notice and immediate use of commercially reasonable efforts as described in this section.

4.5     <u>Correction Period.</u> FaceTime shall have a period of thirty (30) days (the "**Correction Period**") from the end of each Verification Period to rectify any errors that are found and provide to Reuters either (a) a corrected or modified version of the applicable Object Code and Source Code that meets the applicable verification criteria as specified in sections 4.2 and 4.3, or (b) a written statement and a demonstration to Reuters that it is able to verify the software when performing the applicable verification test(s).

4.6     <u>Liquidated Damages.</u> In the event that FaceTime (a) does not make delivery of any of any software identified in section 4.1 on the date specified, or (b) is unable to meet the criteria specified in section 4.5 to correct an Exception during the applicable Correction Period, each day that FaceTime fails meet such applicable deadline shall constitute a "**Delay Day**". Subject to adjustment pursuant to section 4.9 below, Reuters shall be entitled to a damages payment of US$2,500 for each Delay Day (for the purposes of this section weekends are not to be included in any calculation), provided however, that the aggregate amount of any such damage payments for all Delay Days in any Fee payment period shall not exceed the Fee payment to be made by Reuters to FaceTime immediately prior to such Delay Day(s) according to the Fee payment schedule specified in section 6.1. The Parties acknowledge that the type and amount of losses that are likely to be incurred by Reuters as a result of a Delay Day are uncertain, and thus the Parties agree that the amount payable pursuant to this Section represents a genuine pre-estimate of the losses which Reuters will sustain as a result of a Delay Day.

4.7     <u>Limitations.</u> For the avoidance of doubt, the Parties expressly agree that (a) Reuters' right of verification shall not be interpreted to give Reuters the right to reject any software or claim an inability to verify any software based on performance criteria not specified herein or in any attachment hereto or other criteria not specified herein or in any attachment hereto and (b) if at the end of a Verification Period or during any Correction Period (or, if continuing, thereafter) there is a bona fide dispute between the parties, as to whether an Exception has been corrected, then any period of time to be counted hereunder shall be deemed tolled until the resolution of the dispute.

4.8     <u>Development of the Derivative Products.</u> Subject to the restrictions contained herein, Reuters shall, in its sole discretion, determine the schedule on which it develops the Derivative Works and the features and specifications of the Derivative Works.

6

# Source Code Licensing Agreement

4.9 **Adjustments to Payment Schedule and Liquidated Damages.** The due date of the Reuters Fee payment due immediately following any Verification Period or Correction Period (according to the schedule set forth in section 6.1) shall be extended day-for-day by the aggregate number of (i) Delay Days accruing under section 4.6(a) occurring prior to such Verification Period, together with (ii) the number of days post the fifteenth (15th) day of such Correction Period during which FaceTime is unable to correct an Exception of which FaceTime received timely notice during the preceding Verification Period. For purposes of the calculating the date upon which damages for a Delay Day arising under section 4.6 begin to accrue, such date shall be extended day-for day by the aggregate number of days, if any, that Reuters is late in making the Fee payment due immediately prior to the occurrence of the Delay Day(s) upon which the damages are to be calculated.

4.10 **Additional IMA Software Source Code.** FaceTime agrees that, upon receipt from Microsoft Corporation of (a) written confirmation that Reuters has obtained the necessary license therefore, and (b) written authorization that it may do so without additional license fee due to Microsoft, FaceTime shall promptly provide to Reuters under the license terms contained herein, for Reuters' convenience only and not subject to any verification testing specified herein, the Source Code form of the IMA Software containing support for the Microsoft LCS protocols in connector mode and any additional applicable Related Materials. Any Source Code or Related Materials delivered to Reuters pursuant to this section shall become part of the Licensed Materials upon such delivery.

5. **RELATIONSHIP**

5.1 **Initial Training.** At Reuters' request, FaceTime will provide to Reuters, at no additional cost and upon a schedule mutually agreeable to the Parties, up to fifteen business days of assistance and training on the use of the Licensed Materials for the creation of the Derivative Works. Such assistance and training shall be requested upon reasonable advance notice. For the avoidance of doubt, the training and assistance shall be limited to explanation and familiarization with the Licensed Materials by appropriately knowledgeable FaceTime personnel (primary developers who designed the product and infrastructure, primary testers who designed test plans and test strategy, and primary support engineers), but shall not include any work on or additions to the Licensed Materials nor maintenance or support of the Licensed Materials. If requested by Reuters, additional training shall be provided by FaceTime at the rate of $2,000 dollars per day. For purposes of this section, a day of work shall not exceed eight working hours. The training may be conducted remotely, and Reuters will pay the travel, lodging and related expenses of FaceTime personnel for any training held in person at a location other than at FaceTime's training center in Foster City, CA, provided that amounts for such travel, lodging and related expenses shall be reimbursed solely in accordance with Reuters travel and expense reimbursement guidelines.

5.2 **Additional Training.** Beginning in the quarter following the completion of the initial training, as described in section 5.1 above, at Reuters' request, FaceTime will provide to Reuters, at no additional cost and upon a schedule mutually agreeable (such agreement not to be unreasonably withheld) to the Parties, up to one additional day of assistance and training on the use of the Licensed Materials for the creation of the Derivative Works each quarter during the Initial Term. If requested by Reuters, additional training shall be provided by FaceTime under mutually agreed terms. For purposes of this section, a day of work shall not exceed eight working hours.

5.3 **Quarterly Support.** FaceTime shall deliver up to sixteen (16) hours of development support each quarter during the Initial Term of the Agreement at no additional expense to Reuters. If requested by Reuters, additional days of development support per quarter shall be provided by FaceTime at the rate of $2,500 dollars per day. For purposes of this section, a day of work shall not exceed eight working hours. The development will be conducted remotely, and shall entitle Reuters to such updates, patches or other error fixes developed by FaceTime as may be applicable or useful to the proper functioning of the Licensed Materials during the period of quarterly support. As part of the support provided to Reuters under this section during the Initial Term, FaceTime will provide notice to Reuters of such updates, patches or other error fixes as FaceTime reasonably believes are applicable and useful to Reuters in connection with support of the Source Code.

7

## Source Code Licensing Agreement

5.4     **No Exclusivity.** This Agreement shall not be exclusive for either Party. Subject to the licensing restrictions and confidentiality obligations contained herein, this Agreement shall not limit the right of either Party to enter into other agreements with third parties.

5.5     **Independent Contractors.** Neither Party is authorized to make any representations or warranties on behalf of the other or concerning the other's products or services, except as expressly provided in this Agreement. In performing this business relationship, the Parties shall be considered independent contractors entering into a strategic marketing alliance and in no way shall this Agreement be considered to create an employment, agency, joint venture or other similar relationship.

5.6     **Modifications in Product Offerings.** Each Party reserves the right to discontinue the manufacture, distribution, maintenance or license of their products and the right to improve or change the design, price structure, or offering of their products.

5.7     **Relationship Manager.** Upon the execution of this Agreement, each Party shall appoint at least one relationship manager ("**Relationship Manager**") who shall be responsible for managing the relationship contemplated by this Agreement. FaceTime's Relationship Manager will be the point of contact for Reuters.

5.8     **Project Management.** Facetime and Reuters shall instill a Project Management process and assign the necessary resources and personnel in order to conduct weekly project meetings and provide status updates, until verification and acceptance are completed.

5.9     **Press Releases.** Each Party will allow the other Party to review and approve, such approval not to be unreasonably withheld all announcements, press releases, marketing materials and other materials it creates that refer to the other Party before such materials are displayed or released to the public or the press. Neither Party will display or release such materials to the public or press without the other Party's prior written approval. Responses to any request for approval shall not be unreasonably delayed. Notices regarding publicity shall be directed to the Party's Director of Marketing. Both Parties agree to exchange website links, if desired, to place the link on the other Party's website.

6.     **FEES**

6.1     **License Lease Fees.** As payment for the Source Code license during the Initial Term, Reuters shall pay FaceTime eight lease payments totaling One Million Three Hundred Thousand Dollars ($1,300,000). Subject to the provisions of section 4.9, Lease payments shall be due as follows:

| | |
|---|---|
| January 31, 2006 | $200,000 (Net 60 payment) |
| April 30, 2006 | $200,000 (Net 45 payment) |
| July 31, 2006 | $100,000 (Net 45 payment) |
| January 31, 2007 | $200,000 (Due on payment date) |
| April 30, 2007 | $200,000 (Due on payment date) |
| July 31, 2007 | $200,000 (Due on payment date) |
| October 31, 2007 | $200,000 (Due on payment date) |

6.2     **Perpetual License Option and Fee.** Following payment of all lease fees as specified in section 6.1 above, FaceTime grants to Reuters an irrevocable option to purchase (for and on behalf of the Reuters Group) a perpetual, paid-up, royalty-free, worldwide, non-exclusive license to (i) use the Licensed Materials and Related Materials in accordance with the rights granted under Sections 2 and 3 above and/or (ii) use the Derivative Works solely in accordance with the terms and conditions contained in this Agreement, including Sections 2 and 3 above (together the "**Perpetual License**"), subject to payment to FaceTime of One Hundred and Fifty Thousand Dollars ($150,000) (the "**Perpetual License Fees**"). Reuters shall have the right to exercise its Perpetual License Option at any time prior to January 31 2008 and must make payment to FaceTime of the Perpetual

## Source Code Licensing Agreement

License Fees on or before January 31, 2008, unless such date is extended by operation of the express terms of this Agreement. In the event that Reuters elects not exercise its Perpetual License Option or fails to make payment of the Perpetual License Fee when due, Reuters license to use the Licensed Materials shall terminate on such date, provided that such license termination shall not affect Reuters' right, title or interest in any intellectual property of whatever nature in the Derivative Works exclusive of the Licensed Materials.

6.3     <u>Invoicing and Payment of License Lease Fees</u>. Following the first two payments described in section 6.1, FaceTime shall invoice Reuters for each periodic lease payment at least sixty (60) days prior to the date on which the payment is due.

6.4     <u>Reuters Fee Waiver</u>. As material consideration to FaceTime and inducement to FaceTime to enter into this Agreement, Reuters shall, during the Initial Term (and, subject to Reuters' exercise of the Perpetual License Option as expressly provided for under this Agreement, for the term of the Perpetual License), irrevocably waive all fees, including end user certified access fees, applicable to the Compliance Partner Program, which would otherwise be assessed by Reuters against FaceTime or the user or seller of a FaceTime product for its use in connection with the Reuters Messaging Service. FaceTime shall be entitled to participate in the Reuters Messaging Compliance Partner program during the Initial Term, provided that such a program is in place during the Initial Term. For the avoidance of doubt, this fee waiver applies to FaceTime's fees only.

6.5     <u>Taxes</u>. All amounts payable hereunder do not include any sales, use, excise, customs duty, withholding, value-added or similar tax, fee or assessment applicable to any of the transactions contemplated hereunder, including without limitation the licensing and or use of Licensed Materials and the Derivative Works ("Taxes"). Reuters shall be solely responsible for the collection and payment of any and all Taxes arising out of Reuters' commercialization of the Derivative Works hereunder (other than any taxes on FaceTime's net income, other than withholding taxes). To the extent any of the amounts payable hereunder are subject to any withholding tax, Reuters shall increase its payment hereunder such that FaceTime receives the full amount of the fees and other charges payable hereunder.

7.      **INDEMNIFICATION**

7.1     <u>Mutual Indemnification</u>.

      7.1.1.    <u>FaceTime</u>. FaceTime shall indemnify, defend, or at its option, settle, and hold Reuters harmless from and against any and all liabilities, damages, awards, settlements, losses, claims and expenses, including reasonable attorney fees and expenses and costs of investigation ("Damages") arising out of any third party claim, suit or proceeding (other than by any parent or affiliate of Reuters) brought against Reuters based on an allegation that the Licensed Materials (including any Related Materials and/or training materials) or any licensed use of them under this Agreement infringes a patent or copyright or any Intellectual Property Right of any third party ("Claim") to the extent such Claim is not equally based upon the Reuters Messaging Service or that portion of the Derivative Works that do not include the Licensed Materials.

      7.1.2.    <u>Reuters</u>. Reuters shall indemnify, defend, or at its option, settle, and hold FaceTime harmless from and against any Damages arising out of any third party claim, suit or proceeding (other than by any parent or affiliate of FaceTime) brought against FaceTime based on an allegation that the Reuters Messaging Service or the Derivative Works or any licensed use of them under this Agreement infringes a patent or copyright or any Intellectual Property Right of any third party to the extent that such Claim is not equally based upon the Licensed Materials and/or the Related Materials.

      7.1.3.    <u>Indemnification Obligation</u>. The indemnifying Party shall pay all costs and expenses (including reasonable attorneys' fees) incurred by the indemnifying Party in the defense and or

# Source Code Licensing Agreement

settlement of such Claim as well as any damages awarded and then payable against the indemnified Party or agreed to in settlement with respect to any such Claim.

7.2 **Indemnification Procedures.**  When seeking indemnification under this Agreement, the indemnified Party shall give the indemnifying Party: (i) reasonably prompt notice of the claim, suit or proceeding (failure to reasonably promptly provide such notice shall relieve the indemnifying Party from its indemnification obligation with respect to such claim, suit or proceeding only to the extent that the indemnifying Party is materially prejudiced by such failure), (ii) reasonable cooperation, at the indemnifying Party's expense, in the defense of such claim, suit or proceeding, and (iii) the right to control the defense and settlement of any such claim, suit or proceeding, to the extent relevant, provided that the indemnifying Party has acknowledged in writing to the indemnified Party that the indemnifying Party shall thereafter be liable for any loss and any expense relating to the litigation or settlement of such claim, suit or proceeding, provided that, the indemnified Party shall have the right to reasonably approve any settlement which admits wrongdoing on the part of the indemnified Party.  The indemnified Party shall have the right to participate in the defense of any claim, suit or proceeding at its expense.

7.3 **Replacement or Modification of Infringing Product.**  If the Licensed Materials become, or (in FaceTime's reasonable opinion) are likely to become, the subject of any such third party Claim, then FaceTime (at its sole cost and expense) may either: (i) procure for Reuters the right to continue using the Licensed Materials as contemplated hereunder; (ii) modify the Licensed Materials to render them non-infringing (provided such modification does not materially degrade the functionality of the Licensed Materials); or (iii) replace the Licensed Materials with equally suitable, compatible, non-infringing Licensed Materials the specifications of which shall be in all material respects the same as the specifications of the replaced Licensed Materials or portion thereof.  If FaceTime determines that none of the foregoing are commercially practicable despite FaceTime using all reasonable efforts, then Reuters shall be entitled to recover from FaceTime a refund in an amount equal to the remaining value of the Licensed Materials, based on a five-year, straight line amortization of the license fees paid.  In the event of a refund, Reuters will cease all further use of the Licensed Materials.  **The foregoing remedy shall be Reuters' sole and exclusive remedy in the event of a claim of infringement with respect to the Licensed Materials.**

7.4 **Exclusions.**  The foregoing indemnification obligations shall not apply if (a) the indemnifying Party's product or portions or components thereof (i) are modified by the indemnified Party after delivery by the indemnifying Party, including but not limited to the creation of the Derivative Works to the extent that the claim arises because of the modifications, or (ii) are combined with other products, software or code where the alleged infringement relates to such combination, or (b) the indemnified Party continues allegedly infringing activity after being notified thereof or being informed of modifications that would have avoided the alleged infringement, but only with respect to Damages incurred in the period after such notice was given.

## 8. TERM & TERMINATION

8.1 **Term.**  The term of the Agreement shall begin on January 31, 2006.  The initial term of this Agreement shall be two years, and be concurrent and coterminous with the lease of the Licensed Materials and the initial term of the license for the Licensed Materials ("**Initial Term**").  If Reuters elects to exercise its option to acquire the Perpetual License (in accordance with the provisions of Section 6.2) this Agreement will automatically renew as a perpetual license agreement for a perpetual term (the "**Perpetual Term**").

8.2 **Termination for Breach.**  In the event either Party breaches any of its material obligations under this Agreement and does not correct such breach within thirty (30) days after being provided with written notice of the breach, then the non-breaching Party (reserving cumulatively all remedies and rights under this Agreement, at law or in equity, except as otherwise provided here-in) may terminate this Agreement.

## Source Code Licensing Agreement

8.3    **Termination for Bankruptcy/Insolvency.**    Either Party may terminate this Agreement immediately by providing written notice to the other Party if the other Party: (a) ceases to do business in the normal course without a successor in interest, (b) is the subject of any bankruptcy or reorganization proceeding under Title 11 of the United States Code or any successor or similar provision of state, federal, or foreign law or other proceeding related to its liquidation or insolvency (whether voluntary or involuntary; provided that in the case of an involuntary petition such petition must remain undismissed for a period of ninety (90) days after filing) or (c) makes an assignment for the benefit of creditors.

8.4    **Effect of Termination.**

8.4.1    Following termination or expiration of this Agreement, and subject to Sections 8.4.2, Reuters shall not have any further right to copy, use, distribute or sublicense the Licensed Materials or the Derivative Works and both Parties shall return all Confidential Information of the other Party in its possession or under its control except to the extent the same is required to fulfill any obligations which survive termination or expiration. Reuters shall stop all use of the Licensed Materials and to certify to FaceTime in writing that it has returned or destroyed all copies (except those copies contained in Reuters archived data that are certified by Reuters in writing to be impractical to return or destroy) of the Licensed Materials.

8.4.2    Notwithstanding the provisions of Section 8.4.1, upon termination of this Agreement, End Users may, for no additional charge to Reuters and/or End Users, continue to use the Licensed Materials and/or the Derivative Works on the terms of the EULA for a period of up to 6 months following the date of termination of the Agreement (the "**Exit Period**") in order to ensure minimal disruption to End Users using the Reuters Messaging Service and facilitating and implementing an orderly and efficient handover to a Replacement Provider.

8.5    **Survival of Other Terms this Agreement.**    This section 8.5 and sections 1, 2.5, 2.6, 2.7, 5.6, 6.1 (for any payment obligations accrued prior to the date of termination or expiration of this Agreement), 8.4, 9, 10, 11 and 12 shall survive the expiration, termination or cancellation of this Agreement.

9.    **LIMITATION OF LIABILITY**

9.1    NEITHER PARTY NOR ITS LICENSORS SHALL BE LIABLE OR OBLIGATED WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR UNDER CONTRACT, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY:

(I) FOR ANY AMOUNTS IN EXCESS IN THE AGGREGATE OF THE AMOUNTS PAID TO FACETIME UNDER THE TERMS OF THIS AGREEMENT DURING THE ONE YEAR PERIOD PRIOR TO THE CAUSE OF ACTION,

(II) FOR ANY COST OF PROCUREMENT OF SUBSTITUTE GOODS, TECHNOLOGY, SERVICES OR RIGHTS;

(III) FOR INTERRUPTION OF USE OR LOSS OR CORRUPTION OF DATA; OR

(IV) FOR ANY MATTER BEYOND ITS REASONABLE CONTROL.  SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION AND EXCLUSIONS MAY NOT APPLY.

9.2    THE LIMITATION OF LIABILITY SET FORTH IN SECTION 9.1 SHALL NOT APPLY TO FEES PAYABLE BY REUTERS TO FACETIME HEREUNDER OR WITH RESPECT TO

## Source Code Licensing Agreement

EITHER PARTY'S (1) BREACH OF (A) THE LICENSE GRANTS AND RESTRICTIONS UNDER SECTION 2 (LICENSING), BUT IN THE CASE OF AN INADVERTANT BREACH BY REUTERS, SUCH LIABILITY SHALL BE CAPPED AT THE REASONABLE FEES THAT WOULD HAVE BEEN OWED IF REUTERS HAD BEEN GRANTED A LICENSE FOR THE IMPROPER USE; OR (B) THEIR RESPECTIVE CONFIDENTIALITY OBLIGATIONS OR (2) INDEMNIFICATION OBLIGATIONS HEREUNDER PROVIDED THAT IN NO EVENT SHALL EITHER PARTY'S LIABILITY UNDER SECTION 7 (INDEMNIFICATION) FOR PATENT CLAIMS BROUGHT WITH RESPECT TO PATENTS ISSUED IN COUNTRIES OTHER THAN THE UNITED STATES, CANADA, ANY EUROPEAN UNION COUNTRY, SWITZERLAND, JAPAN, SINGAPORE, AUSTRALIA OR NEW ZEALAND (EACH A "NAMED COUNTRY") OR ANY OTHER COUNTRY THAT IS A MEMBER OF THE PATENT COOPERATION TREATY (UNLESS SUCH PATENT IS NOT A COUNTERPART (I.E., FOREIGN-FILED EQUIVALENT OF A NAMED COUNRY PATENT) EXCEED AN AGGREGATE, TOTAL AMOUNT OF ONE MILLION DOLLARS WITH RESPECT TO ALL PATENT CLAIMS OTHER THAN PATENTS ISSUED BY THE PATENT AND TRADEMARK OFFICE OF THE UNITED STATES OR THE EUROPEAN PATENT OFFICE OR (3) LIABILITY WITH RESPECT TO DAMAGES ARISING FROM FRAUD, FRAUDULENT MISREPRESENTATION, DECEIT OR WILFUL MISCONDUCT.

9.3    EXCEPT FOR THE PARTIES RESPECTIVE CONFIDENTIALITY OBLIGATIONS SET OUT IN THIS AGREEMENT, NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, LOSS OF PROFITS, ECONOMIC LOSS, LOSS OF BUSINESS OR CONSEQUENTIAL DAMAGES;

## 10.    REPRESENTATIONS AND WARRANTIES

10.1    **Representations and Warranties**. Each Party warrants to the other that (i) it has the right, power and authority to enter into and fully perform and observe the terms of this Agreement, including, without limitation, make the license grants set forth herein; (ii) the making of this Agreement by it does not and will not conflict in a material way with any agreement between it and any other party; (iii) to its knowledge, without having conducted any independent investigation, any Intellectual Property Rights of it involved in the performance of the terms or subject matter of this Agreement do not infringe or violate the Intellectual Property Rights of any third party and (iv) any promotional materials that are supplied by it are owned or licensed by it and do not to its knowledge violate or infringe any right of privacy or publicity or any Intellectual Property Right of another party, or contain any libelous, defamatory, obscene or unlawful material. Each Party's sole and exclusive remedy and each Party's sole and exclusive obligation to the other based on a breach of this section 10.1 with respect to Intellectual Property Rights shall be as set forth under the provisions of section 7 of this Agreement.

10.2    **Disclaimer of Warranties**. EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT, THE LICENSED MATERIALS AND ANY TRAINING SERVICES ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, AND FACETIME AND ITS LICENSORS DISCLAIM ALL WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT OF THIRD PARTY RIGHTS, PROFITABILITY OR MARKETABILITY OF THE SOFTWARE, ERROR-FREE OR INTERRUPTED USE, AND FITNESS FOR A PARTICULAR PURPOSE.

10.3    **No Additional Warranty to End Users**. Neither Party shall make representations or warranties to End Users or other third parties regarding the performance or functional capability or characteristics of the Licensed Materials or the Derivative Works beyond those stated in the applicable documentation. In the event that a Party nonetheless makes such warranties or representations other than what is expressly provided herein, that Party shall be solely accountable and responsible for such warranties and representations and shall indemnify and hold the other Party harmless from third party claims based on such unauthorized warranties or representations under the provisions of section 7 of this Agreement.

# Source Code Licensing Agreement

## 11.    CONFIDENTIALITY

11.1    **Confidential Information**. "Confidential Information" means a Party's information, not generally known by non-Party personnel, used by the Party and which is confidential and/or proprietary to the Party or the disclosure of which would be detrimental to the Party. Confidential Information includes, but is not limited to, the following types of information (whether or not reduced to writing or designated as confidential): i) information or work product resulting from or related to the Licensed Materials or the Derivative Works; ii) a Party's computer software, including documentation and any of its Intellectual Property Rights and; iii) a Party's internal personnel, financial, marketing and other business information and plans and manner and method of conducting business; iv) a Party's strategic, operations and other business plans and forecasts, and sales prospects; and v) confidential information provided by or regarding a Party's employees, customers, vendors and other contractors. "Confidential Information" does not include information, technical data or know-how which: (i) is in the possession of the receiving Party at the time of disclosure as shown by the receiving Party's files and records immediately prior to the time of disclosure; (ii) prior to or after the time of disclosure becomes part of the public knowledge or literature, not as a result of any inaction or action of the receiving Party; or (iii) is approved for release by the disclosing Party in writing. Notwithstanding the foregoing, in the event that either Party or their respective directors, officers, employees, consultants or agents are requested or required by legal process to disclose any of the Confidential Information of the other Party, the Party required to make such disclosure shall, where feasible, give prompt notice so that the other Party may seek a protective order or other appropriate relief. In the event that such protective order is not obtained, the Party required to make such disclosure shall disclose only that portion of the Confidential Information which its counsel advises that it is legally required to disclose.

11.2    **Return of Confidential Information**. Upon expiration or termination of this Agreement, or if asked by a Party, the other Party will promptly return or destroy (as requested) all Confidential Information and all copies, extracts and other objects or items in which it may be contained or embodied.

11.3    **Use of Confidential Information**. Each Party agrees not to disclose, sell, license, publish, reproduce or otherwise make available the Confidential Information of the other Party except and only to the extent necessary to perform under this Agreement. Each Party agrees to secure and protect the other Party's Confidential Information in a manner at least as protective as that which the Party treats its own confidential and proprietary rights in the information, but in no event less than reasonable efforts, and to take appropriate action by instruction or agreement with its employees, or other agents who are permitted access to the other Party's Confidential Information to satisfy its obligations under this section. Notwithstanding the limitation of liability, both Parties acknowledge and agree that due to the unique nature of the Confidential Information, any breach of this section would cause irreparable harm for which damages are not an adequate remedy. Therefore, the non-breaching Party shall be entitled to equitable relief in addition to all other remedies available at law.

## 12.    MISCELLANEOUS

12.1    **Force Majeure**. Except as otherwise expressly provided in this Agreement and with respect to payment obligations hereunder, neither Party shall be liable for any breach of this Agreement for any delay or failure of performance resulting from any cause beyond such Party's reasonable control, such as: weather, strikes or labor disputes, war, terrorist acts, riots or civil disturbances, governmental regulations, acts of civil or military authorities, or acts of God provided that the Party affected takes all reasonably necessary steps to resume full performance.

12.2    **Assignment**. This Agreement will be binding upon and inure to the benefit of the Parties, their successors and permitted assigns. Neither Party may resell, transfer, or otherwise assign this Agreement or any of its rights or obligations hereunder without the other Party's prior written

# Source Code Licensing Agreement

consent, which consent will not be unreasonably withheld. Notwithstanding the foregoing, either Party may assign this Agreement to an affiliate or to any successor in interest to all or substantially all the business, assets or shares of either Party (provided that such entity has sufficient assets to meet the obligations under this Agreement and is not a competitor of the other Party), whether by operation of law or otherwise, including but not limited to merger (including reverse triangular merger), corporate reorganization, asset sale or any similar transaction. Any attempted assignment in violation of this section will be void and without effect. Subject to the foregoing, this Agreement will benefit and bind the Parties' successors and assigns.

12.3    **Modification**.  No changes, modifications, or waivers are to be made to this Agreement unless evidenced in writing and signed for and on behalf of both Parties.

12.4    **Severability**.  In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

12.5    **Notice**.  Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given to the Party to be notified: (a) upon personal delivery to the Party; (b) one (1) business day following deposit for delivery to the Party with Federal Express or any other internationally recognized overnight courier; (c) for delivery to the Party via registered or certified mail, three (3) business days after deposit with the U.S. Post Office for mailing or (d) upon confirmation of facsimile transmission, at the time noted on such confirmation sheet to the Party and at the fax number noted for each Party, as the case may be (Reuters Limited, c/o Reuters America LLC, The Reuters Building, Three Times Square, New York, New York  10036 Attn: Rania Barakat, Strategic Development & Marketing Manager, 646.223.5906; rania.barakat@reuters.com, with a copy to:  General Counsel at the same address.  FaceTime, Attn: Christopher Dean, SVP Business Development, 650.572.5882; cdean@facetime.com, with a copy to: General Counsel). Each of the Parties to this Agreement may change the location for notice by giving notice to the other Party in accordance with the notice provisions contained in this section.

12.6    **Choice of Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of law provisions thereof.  Any and all disputes arising between the Parties hereunder shall be finally and exclusively settled in, and each Party hereby irrevocably submits to the personal jurisdiction of, the state and federal courts located in the county of New York, New York.

12.7    **Complete Understanding**.  This Agreement (together with the exhibits, and other appendices attached hereto or specifically incorporated herein by reference) constitutes the complete understanding of the Parties, and supersedes all prior or contemporaneous agreements, discussions, negotiations, promises, proposals, representations, and understandings (whether written or oral) between the Parties, with regard to the subject matter hereof, including the letter signed by the Parties dated January 31, 2006, and may not be amended, supplemented, or otherwise modified except by a written agreement executed by both Parties. The headings to the sections of this Agreement are used for convenience only and shall have no substantive meaning. This Agreement may be executed in counterparts or by facsimile, each of which shall be deemed an original, and all of which together shall constitute one and the same agreement.

## Source Code Licensing Agreement

IN WITNESS WHEREOF, FaceTime and Reuters have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**FaceTime Communications, Inc.**

By: _____

Print Name: Christopher S. Dew

Title: Senior VP of BD

Date: 4/30/06

**Reuters Limited**

By: _____

Print Name: PETER MOW

Title: MANAGING DIRECTOR

Date: 10th MAY. 2006

15

Steven M. Hecht (SH-0414)
Jason Halper (JH-9957)
**LOWENSTEIN SANDLER PC**
Attorneys at Law
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
*Attorneys for Plaintiff*
*FaceTime Communications, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FACETIME COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> REUTERS LIMITED, <br><br> Defendant. | **ECF CASE** <br> Civil Action No.  08-4730 (CM) <br><br><br> **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

**THIS MATTER** having been brought before the Court by Plaintiff FaceTime Communications, Inc. ("FaceTime"), through a motion for summary judgment pursuant to Rules 56(a) and 56(c) of the Federal Rules of Civil Procedure; and the Court having considered the parties' papers submitted in support and opposition thereof:

**IT IS** on this _____ day of _____, 2008 hereby

**ORDERED** that FaceTime's motion for summary judgment is **GRANTED**. Accordingly, the Court hereby awards FaceTime the declaratory relief sought in this action, and therefore declares that: *(1)* the parties' Source Code Licensing Agreement terminated as of January 31, 2008 due to Defendant Reuters Limited's failure to exercise its option to purchase a perpetual license by the parties' contractual deadline, and *(2)* as of July 31, 2008, Reuters must cease using FaceTime's source code and all other "Licensed Materials" (as defined in the Source

Code Licensing Agreement) in any manner for any purpose, and must promptly return all such

materials to FaceTime.


_____

Hon. Colleen McMahon, U.S.D.J.

Steven M. Hecht (SH-0414)
Jason Halper (JH-9957)
**LOWENSTEIN SANDLER PC**
Attorneys at Law
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
*Attorneys for Plaintiff*
*FaceTime Communications, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FACETIME COMMUNICATIONS, INC., | **DOCUMENT ELECTRONICALLY FILED** |
| Plaintiff, | Civil Action No.  08-4730 (CM) |
| v. | |
| REUTERS LIMITED, | **CERTIFICATION OF SERVICE** |
| Defendant. | |

I, **JASON E. HALPER**, of full age, do hereby certify as follows:

I am an attorney with the firm Lowenstein Sandler PC, counsel for Plaintiff

FaceTime Communications, Inc. ("FaceTime") in this matter.  I hereby certify that on June 16,

2008, I caused true copies of *(1)* the Notice of FaceTime's Motion for Summary Judgment, *(2)*

FaceTime's Memorandum of Law in support of its motion for summary judgment, *(3)* the

Declaration of Kailash Ambwani, *(4)* the Declaration of Scott Case, *(5)* the Declaration of Deric

Moilliet, *(6)* the Declaration of Jim Obrien, *(7)* FaceTime's Local Rule 56.1 Statement of

Undisputed Material Facts, and *(8)* a proposed Order to be electronically filed with the Court,

and served on the following counsel for Defendant Reuters Limited via E-mail and FedEx:

James F. Rittinger                          Alexandre A. Montagu
Satterlee Stephens Burke & Burke LLP        The Thomson Reuters Building
230 Park Avenue, Suite 1130                 3 Times Square
New York, New York 10169                    New York, New York 10036
jrittinger@ssbb.com                         alex@montagulaw.com


   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States that the foregoing is true and correct.


        /s  Jason Halper (JH-9957)

Dated:  June 16, 2008