UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FACETIME COMMUNICATIONS, INC.,

                          Plaintiff,

          - against -

REUTERS LIMITED,

                          Defendant.

**ECF FILED**

No. 08 Civ. 4730 (CM)(KNF)

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION
TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS**

SATTERLEE STEPHENS BURKE & BURKE LLP

James F. Rittinger (JR-0556)
Justin E. Klein (JK-8865)
Glenn C. Edwards (GE-0696)

Attorneys for Defendant Reuters Limited
230 Park Avenue, Suite 1130
New York, NY 10169
(212) 818-9200

739062_3

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND .......................................................................................................................2

ARGUMENT.............................................................................................................................7

I.  THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLINE TO GRANT THE DECLARATORY RELIEF SOUGHT BY PLAINTIFF............................7

II.  SUMMARY JUDGMENT MUST BE DENIED WITH RESPECT TO TERMINATION OF THE AGREEMENT ....................................................................10

    A.  Reuters' late payment should be excused to avoid forfeiture ...............................11

        1.  New York law will excuse the untimely exercise of an option, or the failure of a condition precedent, in order to avoid a disproportionate forfeiture ........................................................................................12

        2.  Plaintiff has failed to establish its entitlement to summary judgment with respect to forfeiture........................................................................17

            a.  Reuters' failure to make the final payment on January 31 was inadvertent and the product of excusable neglect .........................17

            b.  Timeliness of the final payment was not material and FaceTime suffered no prejudice from the 2-week delay ...............19

            c.  If not allowed to use the Derivative Works, Reuters will suffer greatly disproportionate forfeiture.......................................21

    B.  Plaintiff waived the right to insist on strict compliance with the time limits for exercise of the Perpetual License option.........................................................23

CONCLUSION.........................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

<u>151 W. Associates v. Printsiples Fabric Corp.</u>,
    92 A.D.2d 76, 459 N.Y.S.2d 605 (1st Dep't 1983),
    <u>aff'd</u>, 61 N.Y.2d 732, 472 N.Y.S.2d 909 (1984) ....................................................20

<u>American Power Industries, Ltd. v. Rebel Realty Corp.</u>,
    145 A.D.2d 454, 535 N.Y.S.2d 99 (2d Dep't 1988) ...............................................22

<u>Chase Manhattan Bank v. Motorola, Inc.</u>,
    184 F. Supp.2d 384 (S.D.N.Y. 2002) .....................................................................24

<u>Dow Jones & Co., Inc. v. Harrods Ltd.</u>,
    346 F.3d 357 (2d Cir. 2003) ........................................................................7, 8, 9, 10

<u>Dow Jones & Co. v. Harrods, Ltd.</u>,
    237 F. Supp. 2d 394 (S.D.N.Y. 2002), <u>aff'd</u>, 346 F.3d 357 (2d Cir. 2003) .........................9, 10

<u>Dun & Bradstreet Corp. v. HarperCollins Publishers, Inc.</u>,
    872 F. Supp. 103 (S.D.N.Y. 1995) .........................................................................23

<u>Dutchess Radiology Associates P.C. v. Narotzky</u>,
    192 A.D.2d 1049, 597 N.Y.S.2d 238 (3d Dep't 1993) ...........................................20

<u>Financial Technologies International, Inc. v. Smith</u>,
    247 F. Supp. 2d 397 (S.D.N.Y. 2002) .....................................................................24

<u>J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.</u>,
    42 N.Y.2d 392, 397 N.Y.S.2d 958 (1977) ..............................................12, 13, 14, 18, 22

<u>Kenyon & Kenyon v. Logany, LLC</u>,
    33 A.D.3d 538, 823 N.Y.S.2d 72 (1st Dep't 2006) ................................................24

<u>Kunze v. Arito, Inc.</u>,
    48 A.D.3d 272, 851 N.Y.S.2d 182 (1st Dep't 2008) ..............................................16

<u>M.V.B. Collision, Inc. v. Allstate Insurance Co.</u>,
    No. 07-CV-0187, 2007 WL 2288046 (E.D.N.Y. Aug. 8, 2007) .............................10

<u>Madison Avenue Leasehold, LLC v. Madison Bentley Associates LLC</u>,
    30 A.D.3d 1, 811 N.Y.S.2d 47 (1st Dep't 2006),
    <u>aff'd</u>, 8 N.Y.3d 59, 828 N.YS.2d 254 (2006) .....................................................23, 24

739062_3

Nanuet National Bank v. Saramo Holding Co.,
    153 A.D.2d 927, 545 N.Y.S.2d 734 (2d Dep't 1989) .......................................................... 18

New York Times Co. v. Gonzales,
    459 F.3d 160 (2d Cir. 2006) ................................................................................................. 8

O'Malley v. Ruggiero,
    245 A.D.2d 1129, 667 N.Y.S.2d 531 (4th Dep't 1997)..................................................... 17

Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,
    86 N.Y.2d 685, 636 N.Y.S.2d 734 (1995) ......................................................... 13, 14, 16, 20

Popyork, LLC v. 80 Court St. Corp.,
    23 A.D.3d 538, 806 N.Y.S.2d 606 (2d Dep't 2005)................................................. 17, 19, 22

Pramco III, LLC v. Partners Trust Bank,
    16 Misc. 3d 351, 842 N.Y.S.2d 174 (Sup. Ct. Monroe County 2007)
    aff'd, 2008 WL 2314822 (4th Dep't June 6, 2008) ......................................................... 15

Record Club of America v. United Artists Records, Inc.,
    890 F.2d 1264 (2d Cir. 1989) ........................................................................................... 14

Salahuddin v. Goord,
    467 F.3d 263 (2d Cir. 2006) ......................................................................................... 11, 21

Soho Development Corp. v. Dean & DeLuca Inc.,
    131 A.D.2d 385, 517 N.Y.S.2d 498 (1st Dep't 1987) ..................................................... 16

Sy Jack Realty Co. v. Pergament Syosset Corp.,
    27 N.Y.2d 449, 318 N.Y.S.2d 720 (1971) ...................................................................... 19

Tritt v. Huffman & Boyle Co.,
    121 A.D.2d 531, 503 N.Y.S.2d 842 (2d Dep't 1986) ..................................................... 18

USA Network v. Jones Intercable, Inc.,
    729 F. Supp. 304 (S.D.N.Y. 1990) .................................................................................. 16

United States v. Abady,
    No. 03 Civ. 1683, 2004 WL 444081 (S.D.N.Y. Mar. 11, 2004)...................................... 15

Vitarelli v. Excel Automobile Tech. Ctr., Inc.,
    25 A.D.3d 691, 811 N.Y.S.2d 689 (2d Dep't 2006) ................................................. 12, 13

Wilton v. Seven Falls Co.,
    515 U.S. 277, 115 S. Ct. 2137 (1995) ...................................................................................7, 8

## STATUTES AND RULES

28 U.S.C. § 2201 ...............................................................................................................................7

Fed. R. Civ. P. 12 ............................................................................................................................10

Fed. R. Civ. P. 56 ....................................................................................................................19, 24

## MISCELLANEOUS

II E. Allan Farnsworth, Farnsworth on Contracts 412 ....................................................................14

John D. Calamari & Joseph M. Perillo, Contracts § 11.35 .............................................................16

Restatement (Second) Contracts § 229 ...........................................................................................13

Defendant Reuters Limited ("Reuters"), by and through its attorneys, Satterlee Stephens Burke & Burke LLP, respectfully submits this memorandum of law in opposition to the motion of plaintiff FaceTime Communications, Inc. ("FaceTime") for summary judgment, and in support of its motion to dismiss or for judgment on the pleadings.

## PRELIMINARY STATEMENT

Plaintiff's complaint ("Compl."), as well as its brief in support of summary judgment ("Pls.' Br."), paints a deceptively simple portrait of the dispute between the parties. By plaintiff's lights, this is a simple dispute over the alleged termination of the licensing agreement at issue, based entirely on the fact that Reuters did not submit the final payment due under the agreement – the "Perpetual License" option – until two weeks after the time specified in the contract. FaceTime's motion papers only hint at the true nature of the issues at stake – the "dispute [that] could mushroom into a much larger and complex case" (Pls.' Br. at 3) – and elide over the fact that this "mushroom[ing]" can be avoided only by the Court's ruling in <u>Reuters</u>' favor and denying plaintiff the declaratory relief it seeks.

This strategic bit of misdirection should not, however, be allowed to succeed. Indisputably, the <u>real</u> controversy dividing the parties is whether Reuters may continue to use the software it needs to run its Reuters Messaging Service – software that it adapted (from the plaintiff's duly licensed work) and for which Reuters has already spent over $2 million in development costs – or whether Reuters will, at the expense of loss of good will and significant hardship to its customers, be forced to cease using the software upon which it relies. The declaratory relief sought by FaceTime, limited <u>solely</u> to "whether the parties' [licensing agreement] has expired" (Compl. ¶ 1), will likely not resolve this controversy but is instead precisely the kind of "procedural fencing" that makes declaratory relief inappropriate.

Accordingly, the Court should decline to exercise its declaratory judgment jurisdiction in this case and dismiss the complaint.

At the very least – should the Court entertain plaintiff's request to decide this matter in piecemeal fashion – summary judgment must be denied, for two reasons. First, FaceTime's consistent acceptance of late license payments over the course of the performance of the license agreement established a waiver of its right to insist on timely payment as to the final installment. Second, even if not waived, Reuters' 2-week delay in the final payment represented only a minimal, inadvertent failure that did not prejudice plaintiff in any way. By contrast, however – and despite plaintiff's clear evasion of the issue – a determination by this Court that the agreement terminated <u>could</u> lead to the elimination of Reuters' right to use the so-called "Derivative Works," software into which Reuters has poured substantial time and money to develop and upon which it (and its customers) rely. At the very least, plaintiff has done nothing to demonstrate that such a forfeiture is not possible, and thus its motion for summary judgment must be denied.

## **BACKGROUND**

### **The Reuters Messaging Service**

Reuters is a leading international news and financial information services group. It is also one of the largest international news and television agencies in the world, serving both traditional and new media. Beginning in 2002, Reuters began offering its customers, the majority of whom are financial professionals, an instant messaging service called "Reuters Messaging" ("RM"). RM allows users to communicate with other users of the Reuters Messaging service, as well as with users of AOL Instant Messenger, MSN Messenger and Yahoo Messenger. (Declaration of Eran Barak ("Barak Decl.") ¶ 2.) As a result of the need to comply with federal, state and local laws (e.g., Sarbanes-Oxley), financial institutions have instituted

compliance programs that require, <u>inter alia</u>, these institutions to keep records of electronic communications, including instant messaging systems. (<u>Id.</u> ¶ 3.)

Prior to 2005, however, Reuters did not offer its RM customers a compliance solution in connection with RM. Instead Reuters enabled RM compatibility with compliance products offered by three vendors, one of which was FaceTime. (<u>Id.</u> ¶ 4.) These vendors provided an RM-compatible compliance solution directly to customers of Reuters Messaging in the form of a "Deployed Solution." – i.e., an arrangement under which Reuters' customers would install the vendor-supplied compliance software (along with customizations for the RM system) on-site. Under this arrangement, Reuters customers had a direct relationship with the vendor. (<u>Id.</u> ¶ 7; <u>see also</u> Declaration of Ann Demirtjis ("Demirtjis Decl.") ¶ 4 & Ex. A.)

FaceTime provided its version of the Deployed Solution pursuant to a September 29, 2004 letter agreement, entitled the Product Customization and Licensing Agreement. Pursuant to this agreement, FaceTime agreed to customize its source code in order to allow compatibility with Reuters Messaging.

**The Source Code Agreement and the Hosted Compliance Solution**

In the fall of 2005, Reuters decided to replace the Deployed Solution compliance services offered by the vendors with a product that Reuters itself would host and offer directly to its customers as part of Reuters Messaging (the "Hosted Solution"). (<u>Id.</u> ¶ 8.) In order to build the Hosted Solution, Reuters approached FaceTime for a license to use FaceTime's software as the foundation technology for this solution. (<u>Id.</u> ¶ 9.) In structuring the deal, Reuters did not want a royalty-based arrangement because Reuters wanted to own the Hosted Solution outright without any restraint or involvement by a third party. Therefore, Reuters offered and FaceTime accepted an arrangement pursuant to which Reuters would purchase a license that would allow Reuters to build and own the Hosted Solution, lock, stock and barrel. (<u>Id.</u> ¶¶ 11-12.)

3

This arrangement was memorialized in a term sheet providing for eight quarterly payments of $250,000 each, over the course of two years, along with a final perpetual license payment in the amount of $50,000.  (Id. ¶ 11 & Ex. B.)  The term sheet clearly reflects the parties' intention to give Reuters a perpetual license to use FaceTime's source code in connection with the creation of the Hosted Solution, which Reuters would own.  Specifically, the initial draft of the term sheet stated that "FaceTime will have no IPR rights in any development made by Reuters for or based on the Service." (Id. Ex. A.)  Except for the total price, the deal structure memorialized in the term sheet was substantially the same as the arrangement in the final, signed Source Code Licensing Agreement of January 31, 2006 (the "Agreement", included as Exhibit A to the Declaration of Kailash Ambwani in support of plaintiff's motion).

Significantly, whereas the parties spent considerable time the payment schedule (FaceTime preferred more money up front, while Reuters preferred to spread the money evenly over the course of the contract), because the Parties were in agreement as to the total amount payable, there was no discussion or negotiation concerning the option.  (Barak Decl. ¶¶ 13-14.) The option was simply considered to be the final payment of the Agreement; it was always the basis of the negotiations that Reuters intended to purchase a perpetual license.  (Id. ¶¶ 13-17.) Moreover, there was no discussion during the negotiations that strict compliance with the date of that final payment (or any of the payments) was a critical part of the bargain from FaceTime's standpoint, a fact that is confirmed by the omission of any "time is of the essence" or equivalent language from the Agreement.  (Id. ¶ 18.)

**<u>Reuters' Creation and Use of the Hosted Solution</u>**

In order to create the Hosted Solution, Reuters had to ensure that the hosted compliance product would offer "multi-tenancy" capability – i.e., the product had to function in such a way

that multiple companies could connect simultaneously to Reuters' server.[1] (Demirtjis Decl. ¶¶ 4-5.) Reuters used the Licensed Materials – FaceTime's source code and associated technical materials – to create the Hosted Solution (which the Agreement refers to as the "Derivative Works"). (Id. ¶ 6; Agreement § 2.4.1.) In order to create the Hosted Solution, Reuters made substantial original modifications to the Licensed Materials, including the removal of certain portions of the source code and the addition of significant new lines of code. (Demirtjis Decl. ¶ 6.)

Due to the substantial modifications that Reuters made to the Licensed Materials, the Hosted Solution developed by Reuters is a product that is substantially different from the Licensed Materials themselves.[2] (Id. ¶ 8.) The Derivative Works are the result of substantial investments of time and money by Reuters and its development team – at least $2 million, in addition of course to the license fees themselves. (Barak Decl. ¶¶ 19-20.)

As customized by Reuters, the compliance solution represented by the Derivative Works is now a critical component of the Reuters Messaging Service, for which there is currently no practical immediate substitute. (Id. ¶¶ 21-25.) Simply the cost attributable to forcing Reuters (and its customers) to attempt to transition rapidly (versus a ratable, planned transition) could be around a million dollars.

Moreover, Reuters Messaging is relied upon by at least one hundred of Reuters' customers worldwide. These customers would simply be unable to use RM without its

---

[1] This is in contrast to the Deployed Solution, which simply functioned to work on-site at each individual company's site. (See Demirtjis Decl. Ex. A.)

[2] Specific examples of alterations that Reuters made to the Licensed Materials include: adding features to support various functions such as chatting, file sharing and audit logging of administrator activities; enhancing existing features such as fixing issues in connection with the multi-server feature, and building on the purging capabilities to support global purging for multiple companies; and removing certain features such as unnecessary processing for chat and queries not related to Reuters Messaging. (Demirtjis Decl. ¶ 7 & Ex. B.)

5

compliance capabilities, and it seems clear that they would be forced to turn to other, non-Reuters instant messaging solutions.  Not only would this severely damage Reuters' reputation and customer goodwill, but it would almost certainly lead to customers' turning away from other Reuters products as well – conservatively, the direct revenue loss alone could well run into the several millions of dollars.  In short, any disruption in Reuters' ability to use the Derivative Works would result not only in the loss of the significant investment Reuters has made in developing them, but it would lead to incalculable financial and reputational damage to Reuters as a whole.  (Id.)

**Payments and Disputes under the Agreement**

Throughout the initial term of the Agreement there were various invoicing mistakes on the part of FaceTime, as well as inadvertent late payments on the part of Reuters.  (Declaration of Christopher Lamb ("Lamb Decl.") ¶ 9.)  Nevertheless, the Parties never discussed termination of the Agreement as a result thereof, and FaceTime never refused to accept a delayed payment or even threatened to do so.  (Id. ¶ 10.)  The only dispute that arose in connection with an invoice during this time was in relation to charges that FaceTime presented to Reuters for training and support services – charges that Reuters argued were included in the fees specified in the Agreement, but FaceTime contended were outside that scope.  (Demirtjis Decl. ¶¶ 14-16.)

As of October 9, 2007, Reuters had completed payment to FaceTime for all seven lease payments due under the Agreement in the amount of $1.3 million.  Contrary to its practice with the prior lease payments, however, FaceTime did not send Reuters an invoice for the final perpetual license fee payment that was due at the end of the Initial Term.  (Lamb Decl. ¶ 12.) Approximately two weeks after the January 31st due date, FaceTime notified Reuters that it believed that the Agreement was terminated because it had not received payment for the Perpetual License Fee.  (Id. ¶ 11.)  Reuters promptly wired the $150,000 to FaceTime on

6

February 15, 2008, receipt of which FaceTime acknowledged.  (Id. ¶¶ 13-14.)  However, in communications with Reuters, FaceTime continued to assert its belief that the Agreement was terminated.  (Id. ¶ 15.)

On February 26, 2008, FaceTime sent Reuters an unsolicited wire transfer in the amount of $84,546.50, which FaceTime indicated was a credit for overpayment of invoices.  (Id. ¶ 17.)  Despite Reuters' clear indication that it had remitted payment of the $150,000 as a final payment under the Agreement, FaceTime contended – more than a week after its receipt of the $150,000 payment – that it had unilaterally elected to apply a substantial portion of those funds to invoices that were either disputed or unrelated to the Agreement, and return the remainder of the funds to Reuters.  (Id. ¶ 18.)

## ARGUMENT

### I.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLINE TO GRANT THE DECLARATORY RELIEF SOUGHT BY PLAINTIFF

The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, provides that the Court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a) (emphasis added).  It is well-settled that this statute means precisely what it says, i.e., that the DJA "vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory judgment action or not," and that this grant of discretion is "broad."  Dow Jones & Co., Inc. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003); see also Wilton v. Seven Falls Co., 515 U.S. 277, 286-87, 115 S. Ct. 2137, 2142-43 (1995) ("Since its inception, the [DJA] has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.").  In short, "[t]he Act does not require the courts to issue a declaratory judgment. Rather, it 'confers a discretion on the courts rather than an absolute right

upon the litigant.'"  New York Times Co. v. Gonzales, 459 F.3d 160, 165 (2d Cir. 2006)

(quoting Wilton, 515 U.S. at 287, 115 S. Ct. at 2143).

    The Second Circuit has instructed that, in determining whether to exercise this broad

discretion to grant declaratory relief, district courts should apply the five Dow Jones factors:

> (i) "whether the judgment will serve a useful purpose in clarifying
> or settling the legal issues involved"; (ii) "whether a judgment
> would finalize the controversy and offer relief from uncertainty";
> (iii) "whether the proposed remedy is being used merely for
> 'procedural fencing' or a 'race to res judicata'"; (iv) "whether the
> use of a declaratory judgment would increase friction between
> sovereign legal systems or improperly encroach on the domain of a
> state or foreign court"; and (v) "whether there is a better or more
> effective remedy."

New York Times, 459 F.3d at 167 (quoting Dow Jones, 346 F.3d at 359-60).  Plaintiff's attempt

carefully to circumscribe the declaratory relief it seeks founders on the shoals of (at least) factors

(ii) and (iii), because such relief, if granted, would neither "finalize the controversy" nor "offer

[any] relief from uncertainty," and that FaceTime's request is nothing more than a tactical salvo

in what even it admits is a much broader war.

    It is evident here that, even if granted, the declaration sought by the plaintiff – that the

Agreement terminated as of January 31, 2008 – will do very little, if anything, to address the real

controversy between the parties.  (Indeed, only a contrary finding, i.e., that Reuters' exercise of

the Perpetual License Option was effective, would actually bring an end to the parties' dispute.)

The heart of this controversy is whether, and to what extent, Reuters can continue using the

software that Reuters developed, in part, based on FaceTime's licensed materials, i.e., the

"Derivative Works."  But that issue is not only left unresolved by the plaintiff's requested

declaration, the Derivative Works are – clearly for strategic reasons – barely mentioned in the

Complaint or plaintiff's memorandum.

Indeed, granting the requested relief would only increase, not decrease, the uncertainty regarding Reuters' use of the Derivative Works, because a declaration that the Agreement has terminated of necessity leads to the more pressing and substantive questions, including

- Whether the Derivative Works as currently used in the Reuters Messaging Service in any way contain the Licensed Materials, or whether they have been so transformed by the work of Reuters so that they are not substantially similar to the Licensed Works nor their use a breach of contract;

- Whether continued use of the Derivative Works by Reuters, if prohibited, results in any copyright (or other intellectual property) claims or purely contractual ones;

- Whether use of the Derivative Works is prohibited by § 8.4.1 of the Agreement, and whether this provision is consistent with the ownership of the Derivative Works vested in Reuters by § 2.7, or whether these provisions create an ambiguity that must be resolved (perhaps by resort to parol evidence); and

- The extent to which damages for any prohibited use would be limited by the damage limitations provisions in § 9.2 of the Agreement (including a determination, if appropriate, of the "reasonable fees" for any such use),

just to name a few. In short, plaintiff's requested relief will lead to precisely the "mushroom[ing] into a much larger and complex case" that plaintiff suggests will – somehow – be avoided if only the Court will rush to a decision in a couple of weeks. (Pls.' Br. at 3.) This is a far cry from the "relief from uncertainty" envisioned as a proper use of the declaratory action. See Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394, 437 (S.D.N.Y. 2002) (declining to exercise jurisdiction where, inter alia, "rather than definitively settling the rights of the parties, this Court's exercise of jurisdiction would spur more litigation"), aff'd, 346 F.3d 357 (2d Cir. 2003).

This fact, it seems safe to say, cannot have escaped plaintiff. Thus, the only conceivable reason for FaceTime's proceeding in this fashion is to attempt to gain a valuable weapon (or at least what it perceives as a valuable one) in the ongoing negotiations with Reuters over continued use of the product. This Court does not, however, sit to give plaintiff bargaining

739062_3

chips.  Rather, this attempt at piecemeal resolution – and only the pieces of plaintiff's choosing – is a poor use of judicial resources and precisely the kind of "procedural fencing" that warrants rejection by this Court.  See Dow Jones, 237 F. Supp. 2d at 433 ("In enacting the DJA, Congress empowered the federal courts with a useful means to resolve disputes more expeditiously and economically.").  Accordingly, Reuters respectfully requests that this Court grant its cross-motion to dismiss the complaint in its entirety.[3]

## II.    SUMMARY JUDGMENT MUST BE DENIED WITH RESPECT TO TERMINATION OF THE AGREEMENT

Should the Court proceed to the merits of plaintiff's summary judgment motion, it is clear that it must be denied.  The entire basis for plaintiff's motion is that, by making the final payment due under the Agreement – the Perpetual License option – on February 15 rather than January 31, Reuters failed to exercise its option and the Agreement accordingly terminated.  Under New York law, however, such a de minimis failure will be excused by equity when it was inadvertent, caused no harm to the other party, and would result in disproportionate forfeiture.  Here, the possibility of such forfeiture looms large, and plaintiff – through extremely careful wording designed to sidestep the issue in these proceedings – has done nothing whatsoever to demonstrate the contrary.  Furthermore, plaintiff's theory of termination also fails because its prior acceptance of late payments waived any right to insist, when it became advantageous, on strict compliance with the January 31 deadline.

---

[3] It is unclear whether the proper procedural mechanism for a dismissal in exercise of the court's discretion under the DJA is a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), or for failure to state a claim (brought, in this instance, as a motion for judgment on the pleadings under Rule 12(c)).  Compare Dow Jones, 346 F.3d at 359 (motion had been made as 12(b)(1)) with M.V.B. Collision, Inc. v. Allstate Ins. Co., No. 07-CV-0187, 2007 WL 2288046, at *9 (E.D.N.Y. Aug. 8, 2007) (dismissing under 12(b)(6)).  Either ground, however, is properly raised at this juncture, see Fed. R. Civ. P. 12(h)(2) and (3).

The standards for a summary judgment motion are of course well-established:

> [S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  In deciding whether there is a genuine issue of material fact, we must interpret all ambiguities and draw all factual inferences in favor of the nonmoving party.

Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) (citations omitted).  The initial burden of production is on FaceTime, as the moving party:

> The moving party bears the initial burden of showing why it is entitled to summary judgment.  Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings.

Id. at 272-73 (citations omitted).[4]  It is only if "the movant makes this showing in either manner" that "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact."  Id. at 273.

A.    **Reuters' late payment should be excused to avoid forfeiture**

Assuming that Reuters' exercise of the Perpetual License option did not strictly comply with the requirements of the Agreement, such deviation should nevertheless be excused.  Reuters' notification of exercise and tender of payment in full came only about two weeks after the target date in the Agreement (and immediately after being informed of the deficiency by plaintiff); this lateness was completely inadvertent on Reuters' part and was even a result, in part, of FaceTime's own course of conduct regarding invoicing and late payment.  Plaintiff

---

[4] It is assumed for purposes of this memorandum that it would ultimately be Reuters' burden to establish that any noncompliance with the terms of exercise of the Perpetual License option should be excused due to waiver or forfeiture.

suffered no conceivable prejudice from this 2-week delay. By contrast, should it be determined that failure to properly exercise the option requires that Reuters cease using the Derivative Works it has incorporated into the Reuters Messaging System, Reuters would suffer a forfeiture of its investment (of time and money into revising, customizing and improving upon the Licensed Materials) and customer goodwill that would be "out of all proportion to the gravity of the fault." J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc., 42 N.Y.2d 392, 399,397 N.Y.S.2d 958, 962 (1977). FaceTime has, with regard to excuse of any late payment, failed to even carry its initial burden on summary judgment to demonstrate the lack of evidence to support this defense. Accordingly, summary judgment must be denied.

> **1.    New York law will excuse the untimely exercise of an option, or the failure of a condition precedent, in order to avoid a disproportionate forfeiture**

Under New York law,[5] while it is generally true that full compliance with option terms is required for exercise, it is nevertheless equally true that minor deviations from strict compliance, including untimely exercise, will be excused where required to avoid a disproportionate forfeiture. See, e.g., J.N.A. Realty, 42 N.Y.2d at 397-400, 397 N.Y.S.2d at 961-62; Vitarelli v. Excel Auto. Tech. Ctr., Inc., 25 A.D.3d 691, 691, 811 N.Y.S.2d 689, 690 (2d Dep't 2006). This principle is part and parcel of the generally applicable law in New York that although express conditions must generally be complied with, "[n]onetheless, the nonoccurrence of a condition may yet be excused by waiver, breach or forfeiture. . . . [T]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.'" Oppenheimer

---

[5] As recognized by plaintiff (Pls.' Br. at 9 n.1), New York law governs the Agreement. (Agreement § 12.6.)

& Co., Inc. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 691, 636 N.Y.S.2d 734, 738 (1995) (quoting Restatement (Second) Contracts § 229).

Many of the New York cases applying the foregoing principle have arisen in the real estate context where a lessee's failure to timely exercise a renewal or purchase option was excused by New York courts.  Under these cases,

> Equity will relieve a tenant from a failure to timely exercise an option in a lease to renew or purchase if (1) the tenant in good faith made substantial improvements to the premises and would otherwise suffer a forfeiture, (2) the tenant's delay was the result of an excusable default, and (3) the landlord was not prejudiced by the delay.

Vitarelli, 25 A.D.3d at 691, 811 N.Y.S.2d at 690.  While the application of these principles is in no way limited to leasehold cases, such cases provide a particularly instructive parallel to the dispute at issue here.

First, the analogy between a leasehold and a license is apparent: both are limited grants of rights in property – the former real, the latter intellectual.  (Indeed, as stated by Mark Hadley of the Reuters Finance Department, he viewed the structure of the Agreement as creating a "finance lease" for accounting purposes.   (Declaration of Mark Hadley ("Hadley Decl.") ¶¶ 6-13.) Moreover, the key point differentiating a leasehold option from stock options or other types of options, according to the New York Court of Appeals, is the possibility that the lessee "might suffer a forfeiture if he has made valuable improvements on the property."   J.N.A. Realty, 42 N.Y.2d at 397, 397 N.Y.S.2d at 961.

Here, Reuters has made "valuable improvements on the property" – i.e., the Derivative Works – expending at least $2 million to do so, and integrating the Derivative Works into the Reuters Messaging System, all in reliance upon the assumption that these "improvements" would be usable for the foreseeable future.   Moreover, like a leasehold, these improvements are

necessarily unique to the "property" – the software licensed by FaceTime – and not easily (or even at all) transferable.  In this case, therefore, the possibility of forfeiture (should Reuters be forced to cease using the Derivative Works) is very real.

Contrary to plaintiff's arguments, the rationale underlying the finding of forfeiture in lease cases such as <u>J.N.A. Realty</u> is not solely, or even primarily, about the "unwarranted windfall" to the landlord as a result of the tenant's improvements.  (Pls.' Br. at 12.)  While a party's restitutionary interest – the prevention of unjust enrichment – may indeed play a role at times, it is protection of the obligee's <u>reliance</u> interest that is foremost in the lease cases.  <u>See, e.g.</u>, <u>J.N.A. Realty</u>, 42 N.Y.2d at 399-400, 397 N.Y.S.2d at 399 (noting the tenant's loss of investment and customer good will in finding forfeiture, with no mention of a windfall to the landlord); <u>see also</u> II E. Allan Farnsworth, <u>Farnsworth on Contracts</u> 412 (2d ed. 1998) (discussing preference for avoiding forfeiture as primarily protection of reliance interest).  Indeed, in <u>Oppenheimer</u> – dealing with excuse of nonoccurrence of conditions precedent generally – the  Court of Appeals (citing to the Restatement) defined "forfeiture" as "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance on the expectation of that exchange." <u>Oppenheimer</u>, 86 N.Y.2d at 692 n.2, 636 N.Y.S.2d at 738 n.2.  Thus, the fact that plaintiff here will get no "windfall" from the extensive work  Reuters put into the Derivative Works is in no way indicative of a lack of forfeiture.

Similarly unavailing, as well as simply inaccurate, is plaintiff's suggestion that  the Second Circuit, in <u>Record Club of Am. v. United Artists Records, Inc.</u>, 890 F.2d 1264 (2d Cir. 1989), "declared that the equitable factors present when a real estate tenant misses an option deadline do not apply to a business licensing dispute."  (Pls.' Br. at 12.)  The <u>Record Club</u> court

14

noted (citing the Court of Appeals in <u>J.N.A. Realty</u>) that the conditions present in a lease case leading to a finding of forfeiture (i.e., the loss of improvements to the property) would not typically apply to other types of option contracts, <u>see</u> <u>id.</u> at 1272-73, but as discussed above, such conditions <u>do</u> apply in this case. The Second Circuit simply did not make the sweeping pronouncement suggested by plaintiff; rather, the court held that the record before it involved simply the "inability to buy goods from a particular purveyor" and expressed skepticism – but remanded for further determination[6] – that "the New York courts would deem the loss of a relationship with a licensor or vendor a forfeiture." <u>Id.</u> at 1274. As discussed above, however, it is not the "loss of a relationship" with FaceTime that constitutes the potential forfeiture in this case; it is the loss of the ability to use the Derivative Works, i.e., the improvements that Reuters has made upon a particular software program, upon which it has placed significant reliance (and upon which rests significant customer goodwill). <u>Record Club</u> in no way precludes a finding of forfeiture on such facts.

Indeed, the principle that to avoid disproportionate forfeiture, equity will excuse the nonoccurrence of conditions precedent (including the failure to timely exercise an option) <u>has</u> been found by New York courts to be applicable in situations other than where a lessee has failed to exercise its renewal or purchase option. For example, in <u>Pramco III, LLC v. Partners Trust Bank</u>, 16 Misc. 3d 351, 842 N.Y.S.2d 174 (Sup. Ct. Monroe County 2007), <u>aff'd</u>, 2008 WL 2314822 (4th Dep't June 6, 2008), the court denied summary judgment to the plaintiffs, who sought rescission of a distressed loan purchase on the grounds that the defendant had failed to satisfy the condition precedent of updating the loan review files, because "the doctrine of forfeiture is on these facts clearly invoked." <u>Id.</u> at 362-63, 842 N.Y.S.2d at 185; <u>see also</u> <u>United</u>

---

[6] There is no reported opinion on remand as to the forfeiture issue.

States v. Abady, No. 03 Civ. 1683, 2004 WL 444081, at *5 (S.D.N.Y. Mar. 11, 2004) (student loan lender's failure to satisfy condition precedent of sending invoices would be excused due to disproportionate forfeiture that would be suffered by failure of repayment); Oppenheimer, 86 N.Y.2d at 691-92, 636 N.Y.S.2d at 739 (discussing applicability of excuse of nonoccurrence of condition precedent to avoid forfeiture where lessor had failed to complete condition precedent to lease, but finding no forfeiture under the circumstances); USA Network v. Jones Intercable, Inc., 729 F. Supp. 304, 311-12 (S.D.N.Y. 1990) (applying forfeiture principles to untimely exercise of option to terminate cable services contract, although finding no forfeiture on the facts of case).

Finally, applicability of the avoidance-of-forfeiture principle is particularly apt in this case because "[w]here the option is contained in a lease or other bilateral contract, the courts have been liberal in allowing the late exercise.  This is because the lessee's rental payments during the term of the lease have been part payments for the option . . . ."  John D. Calamari & Joseph M. Perillo, Contracts § 11.35 (5th ed. 2003).  It goes without saying that the Perpetual License option is itself merely one term in a bilateral contract, i.e., the Agreement itself.  That the periodic lease payments were in part payment for the perpetual license option itself is evident from the relatively small size of the final payment, a characteristic feature of finance leases and one that led Mark Hadley to so treat the payments.  (Hadley Decl. ¶¶ 7-13.)  In other words, in this case the perpetual license "option" is rather more akin to the final payment obligation for purchase of the perpetual license, i.e., a constructive condition or promise subject to the doctrine of substantial compliance.[7]  See Oppenheimer, 86 N.Y.2d at 691, 636 N.Y.S.2d at 737.

---

[7]  The two cases cited by plaintiff, Kunze v. Arito, Inc., 48 A.D.3d 272, 851 N.Y.S.2d 182 (1st Dep't 2008), and Soho Dev. Corp. v. Dean & DeLuca Inc., 131 A.D.2d 385, 517 N.Y.S.2d 498 (1st Dep't 1987), are inapposite to the present case.  (Pls.' Br. at 12.)  In Kunze, the court

### 2. Plaintiff has failed to establish its entitlement to summary judgment with respect to forfeiture

As the foregoing demonstrates, Reuters' failure to exercise its option in precisely the timeframe specified in the Agreement may, and should, be excused if (1) the failure was inadvertent; (2) FaceTime has suffered no prejudice (i.e., the time of the final payment was not a material part of the agreed exchange); and (3) Reuters would suffer disproportionate forfeiture. FaceTime's moving papers have not established its entitlement to summary judgment with respect to these elements. See O'Malley v. Ruggiero, 245 A.D.2d 1129, 1130, 667 N.Y.S.2d 531, 532 (4th Dep't 1997) (denying summary judgment where moving party contending failure to exercise option had not carried its initial burden with respect to inadvertence and harm and opposing party had raised issues of fact with respect to forfeiture).

### a. Reuters' failure to make the final payment on January 31 was inadvertent and the product of excusable neglect

With respect to the inadvertence of Reuters' two-week delay in making the final payment, FaceTime says literally nothing: plaintiff thus utterly fails to carry its initial burden as the movant to demonstrate its entitlement to judgment as a matter of law. See Popyork, LLC v.

---

refused to excuse the late exercise of a renewal/purchase option because not only had the tenant made no improvements, he had rented for only one year, was no longer living in the premises and sought the option solely to "gain[] a windfall from the greatly increased value of the property." 851 N.Y.S.2d at 184. Here, as discussed, Reuters has made substantial improvements on the Licensed Materials, which improvements it not only continues to use but relies on heavily; moreover, Reuters' delay was not a tactical attempt to take advantage of an appreciating market and will gain no "windfall," but only what it bargained for. In Soho, the court found no forfeiture because the benefits of the improvements, made early in the lease term, had been fully realized (and depreciated) and that such improvements could largely be transferred to a new location. Moreover, the court was skeptical (to say the least) of Dean & DeLuca's claim that its customers would cease patronizing the store if it had to move to another location in the same neighborhood. 131 A.D.2d at 386-87, 517 N.Y.S.2d at 500. Here, however, Reuters not only expects but is relying on its continued use of the Derivative Works past July 31, and the disruption caused by its sudden inability to use those works would be immediate and highly damaging. (See Barak Decl. ¶¶ 21-25.)

80 Court St. Corp., 23 A.D.3d 538, 539, 806 N.Y.S.2d 606, 608 (2d Dep't 2005) (summary judgment granted to lessee where landlord failed to come forward with any evidence to refute claim that late exercise of option was inadvertent). Although such failure relieves Reuters of any burden to produce evidence to support its claim of inadvertence, Reuters has in fact produced ample evidence to demonstrate that Reuters had always intended to make the final payment and the delay was oversight, nothing more. See Lamb Decl. ¶¶ 3-13; Barak Decl. ¶¶ 13-17; Tritt v. Huffman & Boyle co., 121 A.D.2d 531, 532, 503 N.Y.S.2d 842, 843 (2d Dep't 1986) (finding inadvertence where "it appears highly likely that [tenant] *always* intended to renew the lease"). Plaintiff's own evidence demonstrates that the final payment was tendered immediately after it informed Reuters of the failure.   See Pls.' Br. at 6-7; J.N.A. Realty, 42 N.Y.2d at 396, 397 N.Y.S.2d at 960 (intent to renew option given immediately upon notification); Nanuet Nat'l Bank v. Saramo Holding Co., 153 A.D.2d 927, 928, 545 N.Y.S.2d 734, 736 (2d Dep't 1989) (same).  There is, in short, no evidence whatsoever to suggest that Reuters' delay was intentional (in an attempt, say, to gain advantage of a fluctuating market, see J.N.A. Realty, 42 N.Y.2d at 400, 397 N.Y.S.2d at 962), or that it was the result of anything other than "mere venial inattention," id. at 399, 397 N.Y.S.2d at 962.

The evidence, in fact, makes it clear that FaceTime itself helped create the delay in the final payment. As discussed in Christopher Lamb's declaration, FaceTime had sent invoices to Reuters' Accounts Payable department for the prior lease payments, but failed to do so for the final "option" payment. In addition, FaceTime had also established a history of lax attention to timeliness, both of its own invoices and of Reuters' payments. (Lamb Decl. ¶¶ 9-10, 12.)  While, as discussed *infra* at 23-25, this behavior should be deemed a waiver of FaceTime's right to insist on timely payment altogether, at the very least it establishes a basis for excusing Reuters'

two-week final payment delay.  See J.N.A. Realty, 42 N.Y.2d at 395-96, 397 N.Y.S.2d at 960 (landlord had routinely given notice to tenant of obligations due but did not do so with respect to exercise of option).

<blockquote>

**b.    Timeliness of the final payment was not material and FaceTime suffered no prejudice from the 2-week delay**

</blockquote>

As with inadvertence, FaceTime makes no argument, nor presents any evidence, with respect to any harm it suffered by the 2-week delay in receiving the final payment, and thus plaintiff fails to carry its initial burden on this element as well.  See Popyork, 23 A.D.3d at 539, 806 N.Y.S.2d at 608 (summary judgment granted to tenant where no evidence of prejudice produced by landlord).  Moreover, even if defendants' need to produce evidence were not thereby obviated, plainly defendant cannot be expected, with no discovery whatsoever having taken place in this case, to come forward with any evidence showing a lack of harm to the plaintiff.  Accordingly, at the very least denial of the motion pursuant to Fed. R. Civ. P. 56(f) is warranted.

However, it is readily apparent that no harm was occasioned to plaintiff by the tendering of the final payment on February 15 rather than January 31.  Unlike, for example, stock options, there is no fluctuating market for FaceTime's license option that could have been taken advantage of by Reuters.  Moreover, FaceTime's license to Reuters was nonexclusive (Agreement §§ 2.3, 6.2) and thus any uncertainty engendered by the delay in payment had absolutely no effect on FaceTime's ability to license its product elsewhere, before or after January 31, 2008 – a fact that actually makes excuse of the minor delay even more appropriate than in the leasehold cases.[8]  In short, it is evident that FaceTime suffered no harm at all from the

---

[8]  The principal "harm" to the landlord with which the lease cases are concerned is whether the landlord had already committed to transfer the property to a new tenant or purchaser

delay in payment, but is rather using the delayed payment as a convenient excuse to attempt to extract greater value from Reuters.  See 151 W. Assocs. v. Printsiples Fabric Corp., 92 A.D.2d 76, 80, 459 N.Y.S.2d 605, 607 (1st Dep't 1983) (excusing late exercise where landlord not harmed but rather was "seeking to obtain a greater return on its property" and had "focused attention" on the option provision as a means of canceling the lease), aff'd, 61 N.Y.2d 732, 472 N.Y.S.2d 909 (1984).

Moreover, it is equally evident that this lack of harm, and the lack of criticality in payment timing, would have been apparent to the parties at the inception of the Agreement, and thus there is no reason to believe that making of the final payment of $150,000 on January 31, 2008 as opposed to February 15, 2008 was a "material part of the agreed exchange." Oppenheimer, 86 N.Y.2d at 691, 636 N.Y.S.2d at 418.  Again, plaintiff has made no argument to the contrary.  Nevertheless, the declaration of Eran Barak makes it clear that the negotiation of the Agreement was always premised on the notion that Reuters would ultimately exercise the option and saw the license as a permanent one, and that there was no discussion that the timing of any of the payments was time-critical.  (Barak Decl. ¶¶ 13-18.)  (Any doubt as to this truth is surely dispelled by FaceTime's apparent lack of concern with timely payments over the course of the Agreement.)  See Dutchess Radiology Assocs. P.C. v. Narotzky, 192 A.D.2d 1049, 1050, 597 N.Y.S.2d 238, 239 (3d Dep't 1993) (excusing late exercise of option where, inter alia, the parties "realized the need for and anticipated a long-term, stable relationship").

---

in reliance upon the failure to exercise the option.  See, e.g., Sy Jack Realty Co. v. Pergament Syosset Corp., 27 N.Y.2d 449, 452-53, 318 N.Y.S.2d 720, 721-22 (1971).

### c. If not allowed to use the Derivative Works, Reuters will suffer greatly disproportionate forfeiture

Finally, on the issue of forfeiture, plaintiff once again fails to carry its initial burden on summary judgment: it has neither submitted evidence negating the possibility of forfeiture, nor identified any of Reuters' evidence that demonstrates the absence of a genuine issue of fact on the issue. See Salahuddin, 467 F.3d at 272-73. Thus, once again Reuters' burden of production is not triggered, and summary judgment must be denied.

While submitting no evidence, however, FaceTime does make arguments in its memorandum regarding forfeiture, but not only are these arguments unavailing, they bring into sharp focus the games being played by plaintiff. Plaintiff argues that Reuters would not be "forced to shut down its instant messaging network, nor even give up any customers," but would rather "simply not be permitted to use FaceTime's proprietary source code and the other 'Licensed Materials' going forward." (Pls.' Br. at 13.)

Noticeably absent, however, is any reference to the Derivative Works – which, as plaintiff understands quite well, are the real issue in this case and without which Reuters would, indeed, suffer significant forfeiture. Plaintiff's silence in this regard is made all the more remarkable given its citation to § 8.4.1 of the Agreement, which concerns not only the effect of termination of the Agreement on Reuters' ability to use the Licensed Materials, but also the Derivative Works.

As stated *supra* at 9, the precise meaning of § 8.4.1, its interaction with other clauses in the Agreement, and the overall effect on Reuters' ability to use the Derivative Works, in whole or in part, is unclear.[9] Certainly, to the extent that these issues require an analysis of the

---

[9] Section 8.4.1 is in stark conflict with § 2.7, which makes clear that Reuters owns the Derivative Works.

Derivative Works and the extent to which they overlap or contain the Licensed Materials, or the extent to which they infringe on those Licensed Materials, such issues entail a complex and highly fact-intensive analysis that even plaintiffs cannot (and do not) suggest is ripe for determination at this juncture.

What is made clear by the evidence submitted by Reuters, however, is that if Reuters must cease using the Derivative Works, then not only will Reuters lose the substantial investment of time and money that it poured into development in reliance on the continued use of the Derivative Works, but a significant disruption to the Reuters Messaging Service would likely result, costing Reuters substantial and incalculable damage in terms of customer good will. (Barak Decl. ¶¶ 20-25.) Such a result, if it came to pass, would clearly satisfy the New York definition of "forfeiture." See, e.g., J.N.A. Realty, 42 N.Y.2d at 399, 397 N.Y.S.2d at 962 (forfeiture found based on investment in improvements and loss of "a considerable amount of its customer good will"); Popyork, 23 A.D.3d at 539, 806 N.Y.S.2d at 608 (expenditure of $300,000 in improvements and loss of customer goodwill established forfeiture); Am. Power Indus., Ltd. v. Rebel Realty Corp., 145 A.D.2d 454, 455, 535 N.Y.S.2d 99, 100 (2d Dep't 1988) (finding forfeiture where "the extent of the repairs and improvements, and the costs incurred demonstrated that the plaintiff anticipated" exercise of the renewal option).

The crucial point, then, is that nowhere does plaintiff state that, if the Agreement is deemed terminated by Reuters' late exercise of the Perpetual License option, that Reuters will nevertheless be able to continue to use the Derivative Works in their entirety – and it is certain that no such concession will be forthcoming. Rather, it is crystal clear that, should plaintiff obtain the declaratory relief it seeks, its very next step will be to use that declaration to threaten Reuters with infringement and/or breach of contract for any use of the Derivative Works past

739062_3

July 31.  Because admitting this fact would make the potential for forfeiture obvious, FaceTime seeks to elide that element from its papers, but it has proven itself too clever by half: it is plaintiff's failure to discuss the Derivative Works, and its concomitant failure to demonstrate the lack of any issue regarding forfeiture, that is itself reason to deny summary judgment, as plaintiff has failed to carry its initial burden as the movant.

### B.    Plaintiff waived the right to insist on strict compliance with the time limits for exercise of the Perpetual License option

Finally, FaceTime cannot rely on the fact that Reuters did not tender payment for the Perpetual License option until February 15 as grounds for terminating the Agreement, because through its course of conduct FaceTime waived its right to insist on strict compliance with payment deadlines.  Waiver is "the voluntary abandonment or relinquishment of a known right. It is essentially a matter of intent which must be proved."  Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC, 30 A.D.3d 1, 4, 811 N.Y.S.2d 47, 50 (1st Dep't 2006), aff'd, 8 N.Y.3d 59, 828 N.Y.S.2d 254 (2006).

"Any provision of a contract is subject to waiver, particularly a provision requiring timely payment."  Madison Ave., 30 A.D.3d at 6, 811 N.Y.S.2d at 51 (emphasis added).  Waivable provisions include the non-occurrence of conditions precedent.  See Dun & Bradstreet Corp. v. HarperCollins Publishers, Inc., 872 F. Supp. 103, 110 (S.D.N.Y. 1995).  Here, as described in the declaration of Christopher Lamb, FaceTime repeatedly accepted late payments from Reuters without complaint, and even failed to fulfill its own commitment to invoice Reuters in a consistently timely fashion.  (Lamb Decl. ¶¶ 9-10.)  Such conduct establishes a waiver under New York law:

> Out of simple fairness, a party that has repeatedly waived a condition of performance, particularly the timeliness of payment, is required to give notice that its waiver has been withdrawn before demanding strict compliance with the condition.  This requirement

23

> simply recognizes the reasonable expectations that arise from a course of conduct.

Madison Ave., 30 A.D.3d at 7, 811 N.Y.S.2d at 52 (holding that landlord's failure over course of three years to insist on timely payment precluded its insistence that tenant's late payment constituted default).

As with the elements of excuse of the late option payment for forfeiture, plaintiff has utterly failed to put forward evidence demonstrating a lack of intent to waive; even if it had, defendant would require discovery of plaintiff's intent and thus denial of plaintiff's motion pursuant to Rule 56(f) would be warranted. FaceTime's only argument is a misplaced reliance upon the no-oral-waiver clause of § 12.3 of the Agreement. (Pls.' Br. at 11.) However this clause is of no avail: it is well-settled under New York law that "a contracting party may orally waive enforcement of a contract term notwithstanding a provision to the contrary in the agreement. Such waiver may be evinced by words or conduct . . . ." Madison Ave., 30 A.D.3d at 5, 811 N.Y.S.2d at 51; see also Kenyon & Kenyon v. Logany, LLC, 33 A.D.3d 538, 539, 823 N.Y.S.2d 72, 74 (1st Dep't 2006) ("The existence of a nonwaiver clause does not in itself preclude waiver of a contract clause.").[10] Accordingly, under well-settled New York law, FaceTime's course of conduct established a waiver of its right to insist on strict compliance with the final payment deadline of January 31, and Reuters' immediate tender of payment upon being notified by FaceTime should be deemed adequate to exercise the Perpetual License Option. At

---

[10] Chase Manhattan Bank v. Motorola, Inc., 184 F. Supp. 2d 384 (S.D.N.Y. 2002), cited by plaintiff (Pls.' Br. at 11), is not to the contrary. Under New York law, while contractual provisions guarding against waiver of rights not immediately asserted are not waivable through conduct, provisions forbidding oral waiver are, as indicated by cases such as Madison Ave., so waivable. See Fin. Techs. Int'l, Inc. v. Smith, 247 F. Supp. 2d 397, 407 n.5 (S.D.N.Y. 2002). The provision in Chase Manhattan was of the former, nonwaivable type, see 184 F. Supp. 2d at 395; § 12.3 of the Agreement is of the latter.

the very least, factual issues regarding FaceTime's intent preclude summary judgment in its favor on this point.

### CONCLUSION

Plaintiff's requested declaratory relief will not resolve the true dispute between the parties and is nothing more than an attempt to gain bargaining leverage; the Court should not indulge this improper call upon its resources. Even on the merits, however, plaintiff has not demonstrated that it is entitled to summary judgment. Accordingly, for the foregoing reasons, defendant Reuters respectfully requests that the Court dismiss the complaint in its entirety or, failing that, to deny plaintiff's motion for summary judgment.

Dated: New York, New York
       July 1, 2008

                              Respectfully submitted,

                              SATTERLEE STEPHENS BURKE & BURKE LLP


                              By:_____/s/ James F. Rittinger_____
                                     James F. Rittinger (JR-0556)
                                     Justin E. Klein (JK-8865)
                                     Glenn C. Edwards (GE-0696)
                              230 Park Avenue
                              New York, NY  10169
                              (212) 818-9200
                              Attorneys for Defendant Reuters Limited

25

739062_3