UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FACETIME COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> - against- <br><br> REUTERS LIMITED, <br><br> Defendant. | ECF FILED <br><br> No. 08 Civ. 4730 (CM)(KNF) |

## DECLARATION OF CHRISTOPHER LAMB

I, CHRISTOPHER LAMB, hereby declare:

1. I am a Senior Vice President, Head of Strategic Alliance at Thomson Reuters.[1] I have more than 25 years of experience working in the technology field. Except as indicated below, I have personal knowledge of the matters stated in this declaration.

2. On or around February 28, 2006, I began employment at Reuters in the Enterprise division. My responsibilities included management of the relationship with FaceTime. It was explained to me that we had licensed FaceTime's source code in order to build a hosted compliance solution for Reuters Messaging. I obtained a copy of the Source Code Licensing Agreement with FaceTime.

3. In order to ensure that the payments were made according to the terms of the Agreement, I reviewed Section 6.1 of the Agreement, entitled License Lease Fees. I made note of the remaining fees listed in Section 6.1 and inputted them into my Palm Pilot. I did not,

---

[1] Thomson Reuters was created by The Thomson Corporation's purchase of Reuters PLC on April 17, 2008. The license agreement at the heart of this dispute was entered into with Reuters approximately two years prior to the reorganization. For the sake of simplicity, I will use the term "Reuters" throughout.

however, notice that there was an additional payment term embedded in Section 6.2, which was described as a "perpetual license fee." Therefore, I was unaware that there was a final payment due under the Agreement on January 31, 2008.

4.  At that time, it was my understanding from internal discussions that FaceTime had agreed to provide invoices to Reuters' Accounts Payable department in connection with payments that were due under the Agreement.

5.  In or around August 2006, I became aware of a potential delay in the processing of the payment to FaceTime that was due under the Agreement in July 2006. Therefore, I personally sent an internal request that the payment be processed and paid.

6.  I was made aware that, according to the standard Reuters procedure, the Accounts Payable department would not issue a payment until an actual invoice had been received from the vendor.

7.  After experiencing further difficulties with the timely processing of payments, I sent a specific internal request for the Accounts Payable department to bypass the standard procedure and process future payments in advance of the due dates listed in the Agreement.

8.  However, I do not know whether the Accounts Payable department honored my request in connection with subsequent payments or if it continued to follow the standard procedure.

9.  I have reviewed the payment history in connection with the Agreement, and it appears that at least three of the lease payments due under the Agreement were not made on time in accordance with the due dates listed therein.[2]

---

[2] A review of the invoices that FaceTime sent to Reuters over the life of the Agreement presents considerable confusion because of the timing of their issuance, as well as because of the due date information contained therein. However, by simply reviewing the actual dates on which Reuters remitted payment against the due dates that were listed in the Agreement, it is apparent that three of the payments were at least two weeks late.

10. Despite the fact that three out of the seven lease payments were late, FaceTime never refused to accept payment or threatened to terminate the Agreement because of payments being late.

11. On or about February 13, 2008, I spoke to Deric Moilliet at FaceTime, who informed me that FaceTime had not received the final payment due under the Agreement and that they therefore considered the Agreement to be terminated.

12. The same evening that I spoke with Mr. Molliet, I spoke to members of my team and reviewed the Agreement. I was notified that we had not received an invoice from FaceTime for this payment, but that the Agreement specified that the payment was due on January 31, 2008 (unless this date was extended).

13. I promptly instructed a priority payment in the amount of $150,000 to FaceTime. To that effect, a wire transfer in the amount of $150,000 was sent to FaceTime on February 15, 2008.

14. I then notified FaceTime that the final payment due under the Agreement had been paid and I received confirmation on February 19, 2008, that the payment had been received.

15. Despite its receipt and acceptance of the $150,000, FaceTime continued to insist that the Agreement was terminated because Reuters' payment was not received by January 31, 2008.

16. On February 21, 2008 I met with Deric Moilliet regarding, among other things, the disputed payment and a possible resolution of the matter. Subsequent to this meeting, there were also a series of phone conversations and emails regarding a potential resolution.

17. On February 26, 2008, FaceTime sent Reuters an unsolicited wire transfer in the amount of $84,546.50. FaceTime claimed that this payment was a credit for overpayment of invoices.

18. Despite Reuters' clear indication that it had remitted payment of the $150,000 as a final payment under the Agreement, FaceTime now contends that it decided—more than a week after its receipt of the $150,000 payment--to divert a substantial portion of those funds to invoices that were either disputed or unrelated to the Agreement, and return the remainder of the funds to Reuters.

19. I declare under penalty of perjury that the foregoing is true and correct. I executed this declaration in Boston, Massachusetts on June 26, 2008.

_____
Christopher Lamb