UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

FACETIME COMMUNICATIONS, INC.,

    Plaintiff,

  -against-                              08 Civ. 4730 (CM)(KNF)

REUTERS LIMITED,

    Defendant.

----------------------------------------x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/22/08
```

MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S
CROSS-MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS

McMahon, J.:

    Instant messaging – the preferred medium of communication for America's teenagers – is also a tool used by sophisticated businesses. Market professionals now use instant messaging to dissemitate information in a time-sensitive maner to customers, colleagues and market contacts.

    Defendant Reuters is the well-known global news and financial data service organization. In November 2002, Reuters released an instant messaging software application for financial professionals called "Reueters Messaging," which allows financial professionals to communicate in real time over the internet. Reuters Messaging is connected with three of the largest instant messaging vendors – AOL Instant Messenger, Yahoo! Messenger and MSN Messenger.

    Plaintiff FaceTime, a California company, developd software products that enable IM networks like Reuters Messaging to comply with various regulatory requirements and to protect themselves against malicious use (hacking, electronic viruses, spyware, etc.). FaceTime's software solutions are used by major U.S. financial institutions for IM security management and compliance.

    Reuters began discussions with FaceTime in 2005 to acquire a license to use FaceTime's proprietary source code. After several months, the parties entered into a Source Code Licensing Agreement, dated January 31, 2006 (the Agreement), in which FaceTime agreed to provide Reuters with a non-exclusive license to use certain source code and other "Licensed Materials." Section 8.1 of the Agreement provides that the Initial Term of the license was for a period of two years, beginning January 31, 2006 and ending January 31, 2008. In exchange, Reuters agreed to make eight separate payments, totaling $1.3 million. The license agreement specifically states that

these payments are "payment for the Source Code license during the Initial Term." (Section 6.1). There is no dispute that those payments have been made.

The Agreement permitted Reuters to create and distribute "derivative works" out of the licensed source code and its Related Materials (build plans, build tools, unit testing scripts, integration tests, automation tset scripts, test plans, technical design specifications, funtional specifications and use cases and architecture specifications used in developing the source code). The Derivative Works were to provide compliance and security solutions for Reuters-branded or co-branded messaging and collaboration services. (Section 2.4).

Section 6.2 of the Agreement states as follows:

> Following payment of all lease fees as specified in section 6.1 above, FaceTime grants Reuters an irrevocable option to purchase (for and on behalf of the Reuters Group) a perpetual, paid-up, royalty free, worldwide, non-exclusive license to (i) use the Licensed Materials and Related Materials in accordance with the rights granted under Sections 2 and 3 above and/or (ii) use the Derivative Works solely in accordance with the terms and conditions contained in this Agreement.....
> (the Perpetual License) subject to payment to Face Time of One Hundred and Fifty Thousand Dollars ($150,000). Reuters shall have the right to exercise its Perpetual License Option at any time prior to January 31, 2008 and must make payment to FaceTime of the Perpetual License Fees on or before January 31, 2008, unless such date is extended by operation of the express terms of this Agreement. In the event that Reuters elects not to exercise its Perpetual License Option or fails to make payment of the Perpetual License Fee when due, Reuters license to use the Licensed Materials shall terminate on such date, provided that such license termination shall not affect Reuters' right, title or interest in any intellectual property of whatever nature in the Derivative Works exclusive of the Licensed Material.

The Agreement is quite clear: the intial $1.3 million in fees is for the two year license, and Reuters could render its license perpetual by paying an additional $150,000 after the $1.3 million was fully paid (which is when the option period began) but on or before January 31, 2008. If Reuters failed to exercise its option, the Agreement terminated by its terms. Reuters retained its interest in the Derivative Works it had created while under license to FaceTime, but its interest was "exclusive of the Licensed Material," which made what was left effectively worthless.

Pursuant to Section 8.4.1 of the Agreement, termination ended Reuters right to "copy, use, distribute or sublicense the Licensed Materials or the Derivative Works." Anticipating that Reuters and its customers ("End Users") would need a time cushion if the agreement terminated for failure to exercise the Perpetual License Option, Section 8.4.2 of the Agreement provided:

> Notwithstanding the provisions of Section 8.4.1, upon termination

of this Agreement, End Users may, for no additional charge to Reuters and/or End Users, continue to use the Licensed Materials and/or the Derivative Works on the terms of the EULA [End User License Agreement] for a period of up to 6 months following the date of termination of the Agreement (the "Exit Period") in order to ensure minimal disruption to End Users using the Reuters Messaging Service and facilitating and implementing an orderly and efficient handover to a Replacement Provider.

Finally, the Agreement contains both a "no oral modification" clause (Section 12.3) and a standard merger clause (Section 12.7), which indicates that it constitutes "....the complete understanding of the Parties and supersedes all prior or contemporaneous agreements, discussions, negotiations, promises, proposals, representations, and understandings (whether written or oral) between the Parties with regard to the subject matter hereof...."

The parties never entered into any modification of the Agreement.

The Agreement is governed by New York law.

On February 13, 2008, FaceTime's General Counsel sent a letter to Reuters indicating that the Agreement had expired by its terms due to Reuters' failure to exercise its option to obtain a Perpetual License. At the same time, FaceTime offered to negotiate a new license agreement if Reuters wished.

On February 19, 2008, Reuters emailed FaceTime's accounts receivable department, indicating that it had wired its "final payment" of $150,000 to FaceTime with an "effective date" of 31 January 2008. The email sought confirmation of receipt and acceptance of the funds. The funds had been wired on February 15, 2008 – after the option had expired and after FaceTime had notified Reuters that the option had expired. FaceTime returned the $150,000, less funds that ostensibly met certain other obligations of Reuters to FaceTime. Nonetheless, Reuters takes the position that its (admittedly) late exercise of the option is valid and enforceable under New York law.

FaceTime commenced this action on May 19, 2008, seeking a declaration that the Agreement – and with it, Reuters' license to use the Licensed Materials and to distribute the Derivative Works incorporating the Licensed Materials – expired when the option was not timely exercised, and that Reuters and its End Users have no right to continue to use the Licensed Materials or the Derivative Works after next Thursday, July 31, 2008. The parties have cross moved for judgment: FaceTime for summary judgment and Reuters for judgment on the pleadings.

For the following reasons, FaceTime's motion is granted and Reuters' motion is denied.

Conclusions of Law

I will first consider FaceTime's motion for summary judgment.

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56 (c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the Court to determine. Balderman v. United States Veterans Admin., 870 F. 2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F. 3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industries Co., 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

In this case, the parties' rights turn on the terms of their contract, which is written in plain English and could not be clearer. Reuters agreed to pay FaceTime $1.3 million over two years for the right to incorporate its proprietary security source code into Derivative Work that Reuters would distribute to its customers. The $1.3 million in payments are specifically identified as being attributable to the licensing of the source code during the "Initial Term" (January 31, 2006 - January 31, 2008) of the Agreement.

If Reuters timely made all of its payments toward the $1.3 million (and there appears to be no dispute about this), FaceTime granted Reuters a time-limited option that, if exercised in accordance with its terms, would give defendant a royalty-free Perpetual License to use the proprietary source code. There was no "final payment;" the $150,000 Perpetual License Fee was separate from and in addition to the payments made for Reuters' first two years of use of the source code, and was the payment for the Perpetual License.

The catch was that the option had to be exercised prior to January 31, 2008, and the payment made on or before that date.

The option was not so exercised, and the payment was not so made.

New York takes an exceedingly hard line on time-limited options. Because the holder of the option has absolute control over whether the option will be exercised, New York law requires

that holders comply strictly with the terms of the agreement, exercising it in the manner and within the time specified. Urban Archaeology Ltd. v. Dencorp. Inv., Inc.,12 A.D. 3d 96 (1st Dept. 2004). It is well settled that time is of the essence when an option is being exercised. Id. Indeed, since the holder of the option has the choice of either forcing the optionor to go through with the deal or not, the only protection for the option giver is that the condition be exercised strictly in accordance with its terms. 15 Williston on Contracts §46:12 (Richard A. Lord, ed. 2000).

This appears to be an open-and-shut case. The option was not exercised in accordance with its terms. Indeed, it was not exercised at all, until FaceTime pointed out to Reuters that it had allowed the Agreement to lapse. Then it was purportedly exercised, but not in accordance with its terms.

Reuters – desperate to avoid the consequences of its terrible error – argues that summary judgment in plaintiff's favor would be inappropriate for two reasons.

First, it argues that the court should exercise its discretion by declining to grant declaratory relief in this case and dismissing the case. But while the Declaratory Judgment Act does vest a district court with discretion to determine whether it will exercise jurisdiction over an action seeking declaratory judgment, Dow Jones & Co., Inc., v. Harrods Ltd., 346 F. 3d 357, 359 (2d Cir. 2003), there is no reason for the court to decline to exercise jurisdiction in this case. Contrary to Reuters' argument, the declaratory relief sought by FaceTime will "finalize the controversy" between the parties, because the right (or, more correctly, the lack of any right) of the Reuters and its customers (the "End Users") to use or distribute protective software incorporating FaceTime's proprietary source code after July 31, 2008, is clear and can be easily adjudicated as a simple matter of contract construction. Unlike the Dow Jones case cited by Reuters, the issues here are ripe for adjudication (and have been for the past five and one half months) and there is no reason for delay. In Dow Jones, there was a parallel lawsuit that raised the same issues pending in another country; here there is no alternative forum for resolution of the dispute (indeed, the contract specifies that all disputes must be adjudicated in New York). Finally, the declaratory judgment sought by FaceTime will clarify and resolve all the legal issues at stake between the parties, so it cannot be said that this action was commenced for "procedural fending." See Hummingbird USA, Inc., v. Texas Guaranteed Student Loan Corp., 2007 WL 164111, at *4-5 (S.D.N.Y. Jan. 22, 2007).

Second, Reuters argues that its admittedly tardy exercise of the option should be excused on equitable grounds. It advances a number of contentions in support of this proposition, none of which is persuasive.

Reuters' first "equitable" argument is that its tardiness should be excused because it was "de minimis." As should be clear from the above discussion, there is no "de minimis" exception to New York's bright line rule that time is of the essence where the exercise of an option is concerned. The holder of an option must exercise in a timely manner or he forfeits his right to exercise at all – because there is no longer any offer in existence that he could accept. Marino v. Marino, 140 A.D. 2d 499 (2d Dept. 1988); Manhattan Gear and Instrument Co. v. 2350 Linden Blvd. Corp., 27 A.D. 2d 570 (2d Dept. 1966).

Reuters' second argument is that there is no reason to believe that the making of the final payment on or before January 31, 2008 was a "material part of the agreed exchange." As FaceTime correctly points out, this simply ignores the plain language of the Agreement, which specifies a fixed and firm deadline of January 31, 2008 for paying the Perpetual License Fee. The term cannot be read out of the contract, as Reuters would have me do.

Reuters' third argument is that a pre-contract term sheet somehow supercedes the clear and express terms of the fully integrated agreement. In view of the merger clause, the argument has no force whatever.

Reuters' fourth argument, which relies on extrinsic evidence about its undisclosed intention to exercise the option and internal accounting decisions made by Reuter's finance group concerning how to account for the license payments that were made during the Initial Term, cannot be countenanced for two reasons. First, parol evidence about a contract party's unexpressed intentions is inadmissible to vary the plain meaning of the contract's language; in determining the intention of the parties it is their objective manifestations of intent (found in the words of the agreement), not their unexpressed subjective intentions, that control. Nycal Corp. v. Inoco, PLC, 988 F. Supp. 296, 301 (S.D.N.Y. 1997); Modrynski v. Wolfer, 234 A.D. 2d 901, 902 (A.D. 4th Dept. 1996); Tom Doherty Assoc. v. Saban Entertainment, 869 F. Supp. 1130, 1139 (S.D.N.Y. 1994); Lombardi v. Spera, 151 A.D.2d 649 (A.D. 2d Dept. 1989). Second, evidence about the accounting treatment is inadmissible because it is not needed, in view of the clear language contained in the Agreement. South Rd. Assoc. LLC v. IBM, 4 N.Y. 3d 272, 278 (2005).

Reuters next argues that, notwithstanding the no-waiver clause in the Agreement, FaceTime waived the deadline date for exercising the option, through a course of conduct of failing to insist on strict compliance with the deadlines for the payments of other fees due under the Agreement. I will assume *arguendo* that FaceTime did not always timely invoice Reuters and accepted late payment of the fees set forth in Section 6.1 of the Agreement. However, that is of no moment. There could be no waiver through a "course of conduct" with respect to the exercise of the option because there could be no "course of conduct" with regard to the option. The exercise of the option was a one-time event, not something that happened periodically. Assuming arguendo that FaceTime waived its right to insist on timely payment of the periodic licensing fees for the Initial Term, the could not possibly constitute the knowing relinquishment of its right to insist on strict compliance with the conditions for exercise of an option for a perpetual license.

Reuters' final – and only interesting – equitable argument is that its late exercise of the option should be excused "to avoid a disproportionate forfeiture." Def. Br. at 12. Reuters argues that it has spent considerable time and effort incorporating FaceTime's source code into its Derivative Works – effort that it would "forfeit" if it were foreclosed from exercising the option once the date specified in the contract passed.

Despite its generally harsh treatment of option holders who fail to exercise in accordance with an option's terms, New York courts have been known to permit late exercise in order to avoid a disproportionate forfeiture. Thus far, this right has been limited to the landlord-tenant

context – specifically where the tenant has installed permanent fixtures that he cannot take when he leaves. If those fixtures have value that will accrue to the landlord, the court may conclude that inadvertent failure to exercise a contractual option will work a forfeiture.

However, as the Second Circuit noted in Record Club of America v. United Artists Records, Inc., 890 F. 2d 1264, 1273 (2d Cir. 1989), "Even in the landlord-tenant context, however, a forfeiture is not found lightly." Outside the landlord-tenant context, the Circuit expressed "serious[] doubt that the New York courts would deem the loss of a relationship with a licensor or vendor a forfeiture." Id., at 1274. In Record Club, the Court of Appeals reversed a district court's decision to excuse the late exercise of an option by a licensee of music recordings. Rejecting a "forfeiture" argument identical to the one raised by Reuters here, the Circuit stated that there were no improvements being left behind for the licensor (i.e., there was no "forfeiture") when the license agreement terminated (unlike the landlord-tenant situation, where the landlord reaps the benefit of the tenant's investment in his property). Instead, the licensee was required only to obtain the licensed products from a different vendor. So here, Reuters is free to go to one of FaceTime's competitors and obtain a different type of security source code, whcih it can integrate into its "Derivative Works. " The Agreement clearly spells out that Reuters retains ownership in so much of the Derivative Works as does not constitute FaceTime's source code.

It is true that obtaining a new vendor for products analogous to FaceTime's will require Reuters to rework its security and compliance software – no doubt at great expense. But there is absolutely no authority for the proposition that having to rework the software would constitute a *forfeiture,* as opposed to a loss to Reuters – a loss that Reuters could have avoided by diligently protecting its rights. Certainly there is no forfeiture of anything to FaceTime, since plaintiff will be left with nothing at all on July 31 except what it has possessed all along (its proprietary source code).

The parties have not cited a single case since Record Club in which a New York court found a disproportionate forfeiture, and so excused the failure to exercise an option in accordance with its terms, outside the real estate context. Thus, the Second Circuit's prediction that the exception New York's general rule would be limited to the situation in which a landlord will reap an unwarranted windfall in terms of tenant improvements appears to be correct. If the scope of the limited exception to the "time is of the essence" rule – more particularly, whether or not Reuters' loss of its investment in its security software constitutes a "forfeiture" – is deemed an unsettled question of New York law, this court is in no position to obtain clarification from the New York Court of Appeals. If, on appeal, the Second Circuit sees fit to certify the question, it will do so. As far as this court is concerned, the limited exception to New York's otherwise draconian rule is confined to cases that have nothing to do with the license agreement here at issue.

The Agreement is absolutely clear. The option was not exercised in accordance with its terms, and so lapsed. The Agreement was terminated effective February 1, 2008. Under the terms of the Agreement, Reuters' customers had six months to continue to use security software incorporating FaceTime's source code, and Reuters had six months to make alternative arrangements to provide secure instant messaging to its customers – either by finding a new

supplier of security source code or by negotiating a new agreement with FaceTime. That six months runs out next Thursday. Effective August 1, 2008, neither Reuters nor its clients are authorized to use the Derivative Works in their existing form (i.e., incorporating FaceTime's licensed product).

In short, plaintiff is entitled to the declaratory relief it seeks. The motion for summary judgment is granted. Defendant's cross motions are necessarily denied.

Plaintiff has three business days to submit a form of judgment for review. After that, the Clerk of the Court shall enter judgment in favor of plaintiff.

To forestall further applications: be advised that the court will not stay the effect of its decision. FaceTime told Reuters that the contract had been abrogated in mid-February. Reuters' dilatory conduct includes its decision to postpone until the last minute the ascertainment of its rights. It did not bring an action seeking a declaration of its rights; it has not sought emergency relief in this court. The fact that it now has seven days to reorder its affairs is its own doing.

This constitutes the decision and order of the court.

Dated: July 22, 2008

                                           U.S.D.J.

BY ECF TO ALL COUNSEL